IN THE MATTER OF: THE APPEAL OF THE CHAPEL HILL RESIDENTIAL RETIREMENT CENTER, INC. FROM THE DENIAL OF ITS CLAIM FOR EXEMPTION BY THE ORANGE COUNTY BOARD OF EQUALIZATION AND REVIEW FOR 1979

No. 8110PTC1317

(Filed 18 January 1983)

1. Taxation § 25.10— hearing before Property Tax Commission—sufficiency of evidence to support findings and conclusions

In a hearing by the North Carolina Property Tax Commission, sitting as the State Board of Equalization and Review, concerning a residential retirement center as being exempt from *ad valorem* property taxes under G.S. 105-278.6, G.S. 105-278.7, and Article V, Section 2 of the North Carolina Constitution, the Commission erred in making certain findings and conclusions which were not supported by the evidence; however, the errors shown were not prejudicial since the Commission's essential findings and conclusions were amply supported in light of the whole record.

2. Taxation § 22.1— residential retirement centers—ineligible for charitable purposes exemption from ad valorem property taxes

The North Carolina Property Tax Commission, sitting as the State Board of Equalization and Review, properly found that a residential retirement center was not eligible for the charitable purposes exemption from *ad valorem* property taxes, under G.S. 105-278.6, G.S. 105-278.7, and Article V, Section 2 of the North Carolina Constitution. The center's screening procedures, admission guidelines and fee requirements resulted in its activities benefiting only a limited class of elderly persons rather than humanity in general or a significant segment of the community, and the center's obligation to, at sometime in the future, assume the obligations of some of its residents was too tentative and illusory to justify conclusion that the property is "held" for charitable purposes. G.S. 105-277.1.

APPEAL by petitioner from the North Carolina Property Tax Commission. Decision rendered 29 April 1981. Heard in the Court of Appeals 12 October 1982.

The Chapel Hill Residential Retirement Center, Inc. (hereinafter referred to as the Retirement Center, the Center, or petitioner) seeks a charitable purposes exemption from *ad valorem* property taxes, under G.S. 105-278.6, G.S. 105-278.7, and Article V, Section 2 of the North Carolina Constitution. On appeal from a ruling of the Orange County Board of Equalization and Review adverse to petitioner, the North Carolina Property Tax Commission, sitting as the State Board of Equalization and Review, conducted a full record hearing.

The evidence adduced at the hearing tended to show, in pertinent part, the following.

Petitioner is a non-profit North Carolina corporation that owns over 100 acres of land in Orange County. On its land, petitioner operates a complex which amounts to a self-contained community, known as Carol Woods, designed for elderly residents. The Center consists of 230 apartments, a 60 bed health center, service facilities, a dining hall, a social hall, a gift shop, lounge areas and recreational facilities. Still under construction in 1979, the Center was financed by a $12,700,000.00 loan. At the end of 1979, the corporation had assets approaching $16,000,000.00.

The first residents of the Retirement Center moved in during September of 1979. Within six months, all residential units were occupied. The average age of residents of the Center is 77 years.

Prospective residents of Carol Woods make application for residency to the Retirement Center, providing family and personal information, personal health history, and financial information. Applicants must be financially able to support themselves for a reasonable period of time after their admission and they must be physically able to care for themselves in order to be admitted. Applicants' health status, as verified by a medical doctor's report, is considered by the Center in the admission decision.

Once admitted, residents enter into a contract with the Retirement Center known as a Residence and Care Agreement. Under this contract, each resident must pay a "life-occupancy fee" of at least $21,500.00 upon admission and a monthly "service fee" of at least $444.00. A resident who desires more spacious apartment accommodations or who lives alone must pay a larger fee. In return, the Center agrees to furnish care and assistance to each resident in the form of housing, medical care and services, meals, laundry services, maintenance, utilities, housekeeping services, and recreation area access. The resident may terminate the agreement at any time for any reason and the Center may terminate it if, during the first 90 days, in its judgment the resident's physical or emotional condition prevents the resident from adapting to the life-style at the Retirement Center, or if, at any time, it is discovered that the resident made a material misrepresentation or omission in his application for admission, or if, prior to occupancy, a material change in health occurs. Upon

termination of residency or upon the resident's death, the occupancy fee is refunded, subject to a 2% per month deduction. The Center retains the right, "when necessary in its discretion," to adjust the monthly "service fee" to meet operation costs. Residents are required to carry medical insurance. The "service fees," in part, pay for the services rendered in the Carol Woods health center. Medical expenses related to eyeglasses, hearing aids, dental care, podiatry care, and mental health care must be paid by the individual residents.

The Retirement Center has a policy, expressed in its charter and by-laws, to not terminate any resident solely because he becomes financially unable to pay his "service fee," if such inability is due to circumstances beyond his control. In furtherance of this policy, the Residence and Care Agreement provides that "if the Resident presents to the Corporation facts which in the Corporation's opinion, justify special financial consideration, the Corporation will partially or wholly subsidize Resident's Monthly Rate *providing that such subsidy can be granted without impairing the ability of the Corporation to continue its objectives while operating on a sound financial basis.*" (Emphasis supplied.)

As of the date of the hearing, no resident had become unable to pay his monthly "service fee" and no exceptions to the admission requirements had been made. The Retirement Center received gifts and donations from persons who became members of the Board of Directors and from "other interested persons in the community" totaling $47,529.58, which money was used to conduct a feasibility study before forming the corporation. In 1978, the Center received no contributions; during 1979 and 1980, it received $357.00 in contributions.

After hearing all the evidence, the Commission made extensive "findings" and "conclusions" and, ultimately concluding that the Center's activities were not charitable, affirmed the denial of petitioner's claim for exemption. Petitioner appealed.

*Jordan, Brown, Price & Wall, by John R. Jordan, Jr. and Robert H. Merritt, Jr.; and Bayliss & Hudson, by William H. Bayliss, for petitioner.*

*Coleman, Bernholz, Dickerson, Bernholz, Gledhill and Hargrave, by Geoffrey E. Gledhill, for respondent, Orange County.*

WELLS, Judge.

The scope of appellate review of cases from the Property Tax Commission is set by G.S. 105-345.2. *See In re McElwee,* 304 N.C. 68, 283 S.E. 2d 115 (1981). Subsection (b) of that statute provides, in part, that the appellate court shall decide all relevant questions of law and interpret constitutional and statutory provisions. Subsection (b) further provides that the appellate court may grant relief if the taxpayer's substantial rights have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:

(1) In violation of constitutional provisions; or

(2) In excess of statutory authority or jurisdiction of the Commission; or

(3) Made upon unlawful proceedings; or

(4) Affected by other errors of law; or

(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted; or

(6) Arbitrary or capricious.

Subsection (c) provides that the appellate court must look to the whole record in reviewing the findings, inferences, conclusions and decisions of the Commission. Subsection (c) further provides that the rule of prejudicial error applies in appellate review of cases from the Property Tax Commission. While the weighing and evaluation of the evidence is in the exclusive province of the Commission, *In re Appeal of Amp, Inc.,* 287 N.C. 547, 215 S.E. 2d 752 (1975); *Clark Equipment Co. v. Johnson,* 261 N.C. 269, 134 S.E. 2d 327 (1964), where the evidence is conflicting, the appellate court must apply the "whole record" test to determine whether the administrative decision has a rational basis in the evidence, *In re McElwee, supra, quoting, In re Rogers,* 297 N.C. 48, 253 S.E. 2d 912 (1979). The "whole record" test does not permit the appellate court to substitute its judgment for that of the agency when two reasonable conflicting results could be reached, but it does require the court, in determining the substantiality of evidence supporting the agency's decision, to take into account evidence contradictory to the evidence on which the agency decision relies. Although the court does not make a *de novo* decision, the

evidence required to support an agency decision is greater than that required under the "any competent evidence" standard of review. *McElwee, citing Thompson v. Wake County Board of Education,* 292 N.C. 406, 233 S.E. 2d 538 (1977).

By its assignments of error in the present case, petitioner raises questions regarding the exclusion of evidence, questions as to the sufficiency of the evidence to support the Commission's findings of fact, and questions of law regarding what constitutes a "charity" for purposes of *ad valorem* tax exemption. The questions regarding exclusion of evidence are not properly before us: although defendant contends that the excluded evidence was relevant to its case, defendant failed to make any offers of proof and, therefore, has not preserved these exceptions for our review. *See Currence v. Hardin,* 296 N.C. 95, 249 S.E. 2d 387 (1978).

As to petitioner's assignments regarding sufficiency of the evidence to support the findings and conclusions of the Commission, we hold that, in certain instances detailed below the Commission erred, but that the errors shown are not prejudicial, the Commission's essential findings and conclusions being amply supported in light of the whole record.

As to the questions of law before us, we hold that petitioner is not entitled to *ad valorem* tax exemption as a charity under the statutes and Constitution of North Carolina and that, in light of the facts properly found and the evidence contained in the whole record, the Commission's decision refusing to grant petitioner such an exemption was correct.

I

[1] Petitioner contends that certain findings of fact are not supported by the evidence. The Commission found that "each resident of the Center is required to pay a one-time life occupancy fee ranging from $19,500.00 to $54,500.00 initially, and presently from $21,500.00 to $59,500.00, depending primarily on the size of the unit." Petitioner correctly asserts that the figures representing the upper values, $54,500.00 and $59,500.00, are the costs which two persons pay together when they share a unit. The Commission made a similar error with regard to the monthly occupancy fee rates in finding that the fee for each resident ranged from $565.00 to $975.00 initially and from $656.00 to $1,201.00 at the

time of the hearing. Again, the upper figures represented the fee required of two persons sharing a unit and, thus, they were incorrect. Nevertheless, in light of the facts in evidence, the minimum figures as to each charge were correctly found. These minimum figures clearly support the ultimate conclusion of the Commission. This error is harmless.

The Commission also found that "payment of the occupancy fee entitles the resident to a lifetime occupancy in an unfurnished apartment." While conceding that the Retirement Center does not furnish the apartments, petitioner contends that this finding was error because it overlooks the fact that each resident has numerous services, facilities, and other amenities available by virtue of his residence in the Center. This finding is supported by substantial, uncontroverted evidence and was properly made. Other findings of the Commission make clear the extent of services, facilities and amenities available to residents of the Center.

The Commission found that "the occupancy agreement may be terminated by the Center for a material adverse change in a resident's health or for failure to pay the monthly service charges." Petitioner contends that this finding was erroneous because these rights of termination are substantially qualified by the Residence and Care Agreement. While a change in health may not be the basis of a resident's termination after occupancy, this finding as made by the Commission apparently was taken directly from the language of the Center's standard form Residence and Care Agreement which was in evidence. Elsewhere in its decision, the Commission properly made express findings regarding the protections extended to residents who, after acceptance, become unable to pay. The Commission's failure to expressly find that *after occupancy* a resident cannot be terminated for an adverse change in health is not prejudicial error.

The Commission found that "each resident is entitled to 15 days per year at the Center's Health Care facility without extra charge." Petitioner contends that this finding was erroneously made because it shows that the Commission overlooked the fact that residents can carry over unused cost-free days to subsequent years. This contention is without merit. The finding is clearly supported by competent, uncontroverted evidence. Petitioner has suffered no prejudice due to the Commission's failure to find facts regarding the carry-over provisions.

The Commission concluded "that each applicant must demonstrate . . . that he can afford a monthly service charge greater than the income of many North Carolina residents," that "anyone who is accepted at the Center could live independently at practically any place he chose" and that "collectively, the residents are required to pay the total costs of all the services they receive." These "conclusions" actually constitute findings of fact. Petitioners contend that they are not supported by the evidence. The finding that the residents must, collectively, pay for everything they receive is supported by substantial evidence and was properly made. There was no evidence before the Commission regarding the income of the residents of North Carolina or the cost of living at places other than the Retirement Center; the findings as to those facts were erroneously made since they are not supported by any evidence. Nevertheless, in light of the whole record, these errors are harmless.

## II

[2] Petitioner contends that the Tax Commission erred in concluding that its property is not used for charitable purposes and in denying it exemption from *ad valorem* taxation.

Article V, § 2(3) of the North Carolina Constitution provides that the General Assembly may exempt from taxation property held for charitable purposes. Acting pursuant to this grant of authority, the General Assembly enacted G.S. 105-278.6 and G.S. 105-278.7 which provide in pertinent part as follows:

G.S. § 105-278.6. *Real and personal property used for charitable purposes.*

(a) Real and personal property owned by:

. . .

(2) A home for the aged, sick, or infirm;

. . .

shall be exempted from taxation if: (i) As to real property, it is actually and exclusively occupied and used, and as to personal property, it is entirely and completely used, by the owner for charitable purposes; and (ii) the owner is not organized or operated for profit.

In re Chapel Hill Residential Retirement Center

(b) A charitable purpose within the meaning of this section is one that has humane and philanthropic objectives; it is an activity that benefits humanity or a significant rather than limited segment of the community without expectation of pecuniary profit or reward. The humane treatment of animals is also a charitable purpose.

(c) The fact that a building or facility is incidentally available to and patronized by the general public, so long as there is no material amount of business or patronage with the general public, shall not defeat the exemption granted by this section.

(d) Notwithstanding the exclusive-use requirements of this section, if part of a property that otherwise meets the section's requirements is used for a purpose that would require exemption under subsection (a), above, if the entire property were so used, the valuation of the part so used shall be exempted from taxation.

G.S. § 105-278.7. *Real and personal property used for educational, scientific, literary, or charitable purposes.*

(a) Buildings, the land they actually occupy, and additional adjacent land necessary for the convenient use of any such building shall be exempted from taxation if wholly owned by an agency listed in subsection (c), below, and if:

(1) Wholly and exclusively used by its owner for nonprofit educational, scientific, literary, or charitable purposes as defined in subsection (e),. below . . . .

. . .

(c) The following agencies, when the other requirements of this section are met, may obtain property tax exemption under this section:

(1) A charitable association or institution . . . .

. . .

(e) The fact that a building or facility is incidentally available to and patronized by the general public, so long as there is no material amount of business or patronage with the general

public, shall not defeat the exemption granted by this section.

(f) Within the meaning of this section:

. . .

(4) A charitable purpose is one that has humane and philanthropic objectives; it is an activity that benefits humanity or a significant rather than a limited segment of the community without expectation of pecuniary profit or reward. The humane treatment of animals is also a charitable purpose.[1]

Petitioner relies on *In re Taxable Status of Property*, 45 N.C. App. 632, 263 S.E. 2d 838, *disc. rev. denied*, 300 N.C. 374, 267 S.E. 2d 684 (1980) in its argument that its property is wholly exempt from *ad valorem* taxation as a charity. In that case, this court held that the Seventh Day Adventist Church had been properly granted exemption from *ad valorem* taxation because the property which was owned by the church was gratuitously donated for use by W. R. Winslow Memorial Home, Inc. and because the occupant, Winslow Home, was a charitable institution.

For purposes of our decision in this case, the relevant facts in the Winslow Home case were as follows.

The W. R. Winslow Memorial Home, Inc. is a nursing home operated mainly for the aged and infirm located in Elizabeth City. . . . The home is run as a nonprofit corporation separate from the church . . . . There are no religious or other restrictions on entry, except that maternity, tubercular, alcoholic, mental, or drug addicted patients are forbidden.

All patients must be able to pay the home's fee when they are admitted, but that rule is violated in practice. . . .

---

1. The exclusive use requirement in the above statutes is qualified by both statutory and decisional law. *See In re Forestry Foundation*, 296 N.C. 330, 250 S.E. 2d 236 (1979), *In re Wake Forest University*, 51 N.C. App. 516, 277 S.E. 2d 91, *disc. rev. denied*, 303 N.C. 544, 281 S.E. 2d 391 (1981). It is clear that property "held" for exempt purposes may fall under the definition of property "used" for exempt purposes. *See Cemetery, Inc. v. Rockingham County*, 273 N.C. 467, 160 S.E. 2d 293 (1968). For cases of similar import from other jurisdictions, *see* Annot. 54 A.L.R. 3d 9 (1974).

Medicaid paid all or a portion of the home's fee for most of its patients, but Medicaid placed a ceiling on reimbursements. The home was not allowed to charge the patients or their families the difference between the Medicaid payment and the home's fee. Medicaid paid the home $28.00 per day for skilled care; the home's expenses for skilled care were $31.46 per day. Medicaid paid $23.30 per day for intermediate care; the home's expenses were $24.82. The difference was made up by donations, chiefly from the Winslow Foundation. No patient had ever been forced to leave the home because he or she could not pay the home's fee.

Some patients had been admitted who did not qualify for Medicaid and who could not pay the fee; others were admitted before their Medicaid eligibility or other fee arrangements were determined. It was a policy of the home to try to determine the method of payment before admission. There had been a surplus in recent years, after donations, which the home had used to air condition the original building. The home had no stockholders and paid no dividends. Its assets would be distributed to the church if the corporation were dissolved. . . .

45 N.C. App. at 633-34; 263 S.E. 2d at 839-40.

In the Winslow Home case, this court found the following comment persuasive as to the meaning of the word "charity" as it is used in G.S. 105-278.7.

"The concept of charity is not confined to the relief of the needy and destitute, for 'aged people require care and attention apart from financial assistance, and the supply of this care and attention is as much a charitable and benevolent purpose as the relief of their financial wants.'"

*Central Board on Care of Jewish Aged, Inc. v. Henson,* 120 Ga. App. 627, 171 S.E. 2d 747 (1969), *quoting Bozemon Deaconess Foundation v. Ford,* 151 Mont. 143, 439 P. 2d 915 (1968). While we affirm this statement as it applies to the Winslow Memorial Home, the facts of the present case demonstrate that merely supplying care and attention to elderly persons cannot, alone, constitute charity. Petitioner does not rely on outside funding in order to operate. The contributions it has received are not a

primary source of its financing. The Center is more in the nature of a cooperative operated for the mutual benefit of its residents who collectively pay for their care; it is not an institution providing for the special needs of individuals who are in need of charity, the aid of whom benefits society as a whole in addition to the residents. The present case is distinguishable from *In re Taxable Status of Property* and the Georgia case it relied upon because those cases, unlike this one, involved property owners who were receiving and relying upon donations from outside sources for the operation of their programs.

Petitioner's screening procedures, admissions guidelines and fee requirements result in its activities benefiting only a limited class of elderly persons rather than humanity in general or a significant segment of the community.

Petitioner next contends that it is charitable because it has a policy under which it will not, if possible, terminate any resident if, solely because of circumstances beyond his control, he becomes financially unable to pay his "service fee." Petitioner is contending, essentially, that its property is "held" for an exempted use. This argument cannot be sustained for two reasons. First, where property is being *used* for non-exempted purposes, it cannot classify as being *"held"* for exempted purposes. *See Cemetery, Inc. v. Rockingham County, supra.* The current use of the property prevents it from being "held" for some other use. Under the charter and bylaws of the Retirement Center and the provisions of the Residence and Care Agreement, petitioner is not bound to retain residents who become unable to pay their "service fee," the charter and bylaws merely reciting an espoused "policy" and the Residence and Care Agreement leaving in the unbridled discretion of the corporation the decisions as to whether the resident is in fact in need of financial aid and whether the extension of such aid to the indigent resident will be harmful to petitioner's objectives and financial well-being. The Center's obligation to, at some time in the future, assume the obligations of some of its residents is too tentative and illusory to justify a conclusion that the property is "held" for charitable purposes.

Our holding is supported by our consideration of the provisions of G.S. 105-277.1, which provided in pertinent part, as follows:

§ 105-277.1. *Property classified for taxation at reduced valuation.*

(a) The following class of property is hereby designated a special class under authority of Article V, Sec. 2(2), of the North Carolina Constitution and shall not be assessed for taxation: The first seven thousand five hundred dollars ($7,500) in assessed value of property owned by a North Carolina resident and, if real property or a mobile home, occupied by the owner as his or her permanent residence and, if household personal property, used by the owner in connection with his or her permanent residence, provided that, as of January 1 of the year for which the benefit of this section is claimed:

> (1) The owner is either (i) 65 years of age or older or (ii) totally and permanently disabled, and
>
> (2) The owner's disposable income for the immediately preceding calendar year did not exceed nine thousand dollars ($9,000) . . . .
>
> . . .

For married applicants residing with their spouses, the disposable income of both spouses must be included, whether or not the property is in both names.

(b) Definitions.— When used in this section, the following definitions shall apply:

> . . .
>
> (3) "Permanent residence" means legal residence. It includes the dwelling, the dwelling site, not to exceed one acre, and related improvements. The dwelling may be a single family residence, a unit in a multi-family residential complex or a mobile home. . . .[2]

To allow petitioner's property to qualify for exemption because its residents are elderly would be to give such persons clearly preferential treatment over those persons over 65 years of age

---

2. By amendments to the statute, the dollar amounts of value and income are now $8,500.00 and $9,000.00, respectively.

who continue to live in their own discretely owned residences. While we recognize and applaud efforts similar to Carol Woods as being a progressive and desirable approach to the residential and health care and personal security of elderly persons, these laudable aspects of petitioner's operation do not suffice to bring it within the statutory classification of a charitable purpose.

In light of the whole record, petitioner is not entitled to exemption from *ad valorem* taxation under the provisions of G.S. 105-278.6 or G.S. 105-278.7 because no part of its property is being used for charitable purposes. *See and compare* cases discussed in *Annot.*, 37 A.L.R. 3d 565 (1971). The material findings and conclusions of the Property Tax Commission are supported by competent, material and substantial evidence in light of the whole record. The Order of the Property Tax Commission is

Affirmed.

Judges HEDRICK and ARNOLD concur.