IN THE MATTER OF: THE APPEALS OF JOYCE BARHAM AND JOSEPH BARBOUR, JR., FROM THE EXEMPTION OF CERTAIN PROPERTY OWNED BY LUTHERAN RETIREMENT MINISTRIES OF ALAMANCE COUNTY, NORTH CAROLINA, BY THE ALAMANCE COUNTY BOARD OF EQUALIZATION AND REVIEW FOR 1982

No. 8310PTC1101

(Filed 4 September 1984)

Taxation § 22.1 — residential retirement center — no charitable purpose — no exemption from ad valorem taxes

A residential retirement center operated by a non-profit corporation formed by a church was not being used for a charitable purpose within the meaning of G.S. 105-278.6 so as to qualify for exemption from *ad valorem* taxes

where residents must pay admission fees ranging from $15,000 to $60,000 and monthly occupancy fees ranging from $495 to $1,485 depending upon the type of accommodations and care each resident requires; the church states that it has a moral commitment to subsidize residents who become unable to meet the monthly occupancy fee but residency contracts require payment of the fee as a condition of continued residence; and although a large sum of money for the project was advanced by an estate, the non-profit corporation intends to reimburse such money to the estate.

APPEAL by Lutheran Retirement Ministries of Alamance County, North Carolina from the 1 June 1983 decision of the North Carolina Property Tax Commission. Heard in the Court of Appeals 22 August 1984.

Lutheran Retirement Ministries of Alamance County, North Carolina (hereinafter LRM) is a non-profit corporation. LRM has purchased 62.9 acres of land upon which they plan to construct the Twin Lakes residential retirement center. LRM was formed to carry out the directions of Wade G. Coble's will regarding the establishment of a home for the elderly.

In his will Mr. Coble left the residue of his estate, approximately four million dollars, to Macedonia Evangelical Lutheran Church on the condition that they use the money to create a retirement home. The Church formed LRM to implement Mr. Coble's wishes. LRM developed the plan for Twin Lakes retirement facilities. Twin Lakes' facilities are to consist of a skilled nursing facility, an intermediate care facility, a retirement home and an independent living facility. Individuals are eligible for admission after they reach 62 years of age. The admission fees range between $15,000.00 and $60,000.00. Each resident must also pay a monthly occupancy fee ranging from $495.00 to $1,485.00. These fees are graduated based upon type of accommodations and care each individual requires. LRM states that it has a moral commitment to subsidize residents who become unable to meet the monthly occupancy fee at some time after they are admitted. Residency contracts, however, require payment of the admission of the fees as a condition of continued residence. LRM makes no legal commitment to subsidize residents unable to pay.

Based upon this plan for the development of the property LRM submitted an application for an exemption from property taxes contending that the property was to be used for a charitable purpose. The tax supervisor denied the petition and LRM

appealed to the Alamance County Board of Equalization and Review. The Board approved the request. Joyce Barham and Joseph Barbour, private citizens and taxpayers of Alamance County, appealed this ruling to the North Carolina Property Tax Commission pursuant to N.C. Gen. Stat. § 105-324(b) (1977). LRM was allowed to intervene in the suit on 30 November 1982. On 25 January 1983 a hearing was conducted. On 1 June 1983 the Commission entered its final decision overruling the Alamance County Board of Equalization and Review. The Commission made numerous findings of fact and based upon these findings concluded that property did not qualify for the charitable purpose exemption and that the application must therefore be denied. From the decision, LRM appealed.

*Vernon, Vernon, Wooten, Brown and Andrews, P.A., by John H. Vernon, III and R. Joyce Garrett, for Lutheran Retirement Ministries.*

*Joe Barbour, Jr., pro se, for appellees.*

WELLS, Judge.

The scope of review for cases appealed from the Property Tax Commission is governed by N.C. Gen. Stat. § 105-345.2 (1979) which in pertinent part provides:

. . .

(b) [T]he court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning and applicability of the terms of any Commission action. The court . . . may reverse or modify the decision if the substantial rights of the appellants have been prejudiced because the Commission's findings, inferences, conclusions or decisions are:

(1) In violation of constitutional provisions; or

(2) In excess of statutory authority or jurisdiction of the Commission; or

(3) Made upon unlawful proceedings; or

(4) Affected by other errors of law; or

(5) Unsupported by competent, material and substantial evidence in view of the entire record as submitted; or

(6) Arbitrary or capricious.

(c) In making the foregoing determinations, the court shall review the whole record or such portions thereof as may be cited by any party and due account shall be taken of the rule of prejudicial error.

. . .

The dispositive issue presented by LRM is whether the Commission correctly concluded that its retirement home property was not being held or used for a charitable purpose within the meaning of N.C. Gen. Stat. § 105-278.6 (1973), which in pertinent part provides:

(a) Real and personal property owned by:

. . .

(2) A home for the aged, sick or infirm;

. . .

shall be exempted from taxation if: (i) As to real property, it is actually and exclusively occupied and used, . . . by the owner for charitable purposes; and (ii) the owner is not organized and operated for profit.

(b) A charitable purpose within the meaning of this section is one that has humane and philanthropic objectives; it is an activity that benefits humanity or a significant rather than limited segment of the community without expectation of pecuniary profit or reward. . . .

Our decision to affirm the Commission is controlled by our decision in *In re Chapel Hill Residential Retirement Center*, 60 N.C. App. 294, 299 S.E. 2d 782, *disc. rev. denied*, 308 N.C. 386, 302 S.E. 2d 249 (1983).

In its order in this case, the Commission made the following pertinent findings of fact:

. . .

(34) A document entitled "Twin Lakes Center—*Requirements for Admission*," which is included in the application packet, contains the following statement concerning financial status:

Applicants are required to fill out a Financial Statement listing assets, liabilities, and income that will satisfy Twin Lakes Center that the applicant will have adequate financial resources to pay the cost of residency at the Center, barring unforseeable [sic] circumstances and assuming continuing inflation over the period of life expectancy. Applicants will certify this information as true to the best of their knowledge. At the request of the Executive Director, applicants will also be asked to verify their Financial Statements with communications from banks, trust officers, etc.

(35) The requirements for admission document also contains a statement concerning insurance status:

All applicants 62 years of age or more at the time of admission will be required to carry Medicare insurance A and B, if eligible, and one additional approved policy or supplemental health care policy with major medical provisions. Those not eligible for Medicare will be required to carry comparable health insurance as approved by the Admissions Committee. Benefits from all such insurance for services rendered or paid for Twin Lakes Center must be assigned to Twin Lakes Center.

. . .

(37) One of the registration forms for Twin Lakes Center requests financial data from the resident "in order that the Board of Lutheran Retirement Ministries will have assurance that your financial resources will be adequate to fulfill your needs as a resident."

. . .

(39) The Residency Contract provides that the monthly occupancy charge "shall be adjusted annually" on January 1 of each year. The adjustments "shall be determined by the costs of maintaining and operating the Retirement Center including reasonable reserves for operating capital and replacement of facilities."

(40) Section 3.2 of the Residency Contract permits the Center to terminate the resident's right to occupy "if Resident fails to pay the Monthly Service Charge for the Living Unit or charges for other services and facilities provided by the Center."

(41) The Contract contains the following "Condition of Occupancy":

Resident's right to occupy shall be conditioned upon Resident meeting the minimum health and financial standards established by Twin Lakes and in effect on the Initial Occupancy Date. If Resident fails to satisfy such health or financial standards any portion of the admission fee that has been paid by Resident shall be refunded with interest and the Center shall have no other obligation to Resident under this Agreement.

. . .

(43) Under the Contract the resident agrees to pay all costs of collection, including attorney's fees, if the resident fails to pay any amount due under the Contract.

(44) Twin Lakes required a non-refundable application fee of $100.00.

(45) The schedule of admission fees and monthly service charges for living units at Twin Lakes is as follows:

| Accommodations | Base Admission Fee | | Estimated Monthly Service Charge |
| --- | --- | --- | --- |
| | One Occupant | Two Occupants | |
| Independent Living: | | | |
| Efficiency | | | $495 (single) |
| Apartments | $15,000 | $15,000 | $645 (double) |
| Lakes Apartments: | | | |
| 1 Bedroom | $22,000 | $22,500 | $325 |
| 2 Bedroom | $27,000 | $27,500 | $425 |
| Lakes Duplex | | | |
| Apartments: | $45,000 | $45,000 | $400 |
| Cottages | $60,000 | $60,000 | $550 |

Health Center:
  Intermediate Care

| | | | |
|---|---|---|---|
| Nursing | None | None | $1125 |
| Skilled Nursing | None | None | $1485 |

(46) The schedule states that fees are subject to change without notice.

. . .

(52) The admissions committee had received 133 applications for admission as of the date of the hearing. The committee has rejected none of the applications and has received financial statements from 31 applicants who have paid 10% of their admission fee.

(53) Mr. Berg testified that in individual cases entrance requirements for Twin Lakes have been waived.

(54) The audited financial statement of the Coble Memorial Fund as of September 30, 1982, contains a "Note B — Financially Interrelated Organizations," which reads in part as follows:

The Fund advances money to the Ministries as needed . . . . These advances are non-interest bearing. The Ministries intends to repay the Fund after the life-care center becomes operational and self-supporting.

(55) The audited financial statement of the Lutheran Retirement Ministries of Alamance County as of September 30, 1982, contains a "Note B — Financially Interralated [sic] Organizations," which includes a statement that "[m]anagement intends to repay the Fund after the life care center becomes operational and self-supporting."

(56) (Collectively, the residents of Twin Lakes will pay the total cost of all the services they will receive.)

(57) On June 30, 1982, the directors of LRM adopted a resolution which reads in part as follows:

BE IT RESOLVED that Lutheran Retirement Ministries shall actively review a request by an elderly person who does not have financial resources sufficient to meet the occupancy fee or service charges and shall, on a case by case basis, make a

determination of the extent to which it can subsidize that person to a greater degree than it does other residents without impairing its ability to provide quality care to all residents.

(58) There is no legal obligation on the part of LRM to retain a resident who becomes unable to make monthly payments to Twin Lakes.

LRM contends that this case is distinguishable from *In re Chapel Hill Residential Retirement Center, supra.* One point of distinction relied upon by LRM is that a larger percentage of its funds are to be generated from outside sources. LRM points particularly to the gift from the Coble estate. LRM, while conceding that the costs to residents are high, further argues that these funds will not meet the total cost of care and that Twin Lakes must rely on outside gifts to supplement its revenues. LRM also distinguishes this case from *In re Chapel Hill Residential Retirement Center, supra,* by pointing to the relationship between LRM and the Lutheran Church. They point to the Church's "moral commitment" to provide funds for the facility should LRM fall short.

In order to qualify for an exemption from *ad valorem* taxes, property must be used for a humane and philanthropic purpose and it must be used to benefit a significant segment of the community. LRM argues that it meets the qualifications because Twin Lakes would provide for the basic social needs of its residents for love, safety and a sense of belonging. LRM further argues that a significant portion of the elderly in the Alamance County area would be able to afford these services.

We cannot agree with LRM's contentions. As we stated in *In re Chapel Hill Residential Retirement Center, supra*: "merely supplying care and attention to elderly persons cannot, alone constitute charity." Here, as in *In re Chapel Hill Residential Retirement Center, supra,* the residents will be paying large sums of money for the services rendered. While it is true that the bequest of Wade Coble furnished more outside money than was present in *In re Chapel Hill Residential Retirement Center, supra,* it also appears that the funding for the every day operation of the project will come mainly from the funds paid in by the residents. As the Commission found, financial statements from both the Coble Estate and LRM indicate that LRM intends to reimburse any

monies advanced by Coble. Further, LRM's screening procedures, admissions guidelines and admission and occupancy fees are at such a level that common sense tells us that only a small percentage of the elderly could feasibly participate in LRM's retirement center. We would also note that while LRM talks of a "moral commitment" to furnish lifetime care to those residents who become unable to provide the fees mandated by the contract, LRM reserves the right to terminate any resident for non-payment of fees.

We have considered LRM's other assignments of error, find them to be without merit, and overrule them. Considering the whole record we hold that the findings and conclusions of the Commission are supported by competent, material and substantial evidence, and their order denying the exemption must be and hereby is

Affirmed.

Chief Judge VAUGHN and Judge HEDRICK concur.