529 A.2d 852

SUPERVISOR OF ASSESSMENTS OF
MONTGOMERY COUNTY

v.

ASBURY METHODIST HOME, INC.

No. 1392, Sept. Term, 1986.

Court of Special Appeals of Maryland.

Sept. 2, 1987.

Jane E. Pilliod, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. and Kaye Brooks Bushel, Asst. Atty. Gen., on the brief), Baltimore, for appellant.

Joseph V. Truhe, Jr. and James L. Thompson (Miller, Miller & Canby, on the brief), Rockville, for appellee.

Argued before GILBERT, C.J., and ROSALYN B. BELL and KARWACKI, JJ.

ROSALYN B. BELL, Judge.

The Supervisor of Assessments of Montgomery County appeals a decision of the Circuit Court for Montgomery County. The circuit court, in reversing a decision of the Maryland Tax Court, decided that three apartment buildings located on a campus in Gaithersburg and owned by Asbury Methodist Home, Inc. (Asbury), appellee, were exempt from real property taxes for the 1983–84 tax year under Md.Code Ann. Art. 81, § 9(e) (1957, 1980 Repl.Vol.).

The Supervisor argues that the court erred in reversing the tax court because that body's decision was correct as a matter of law and was supported by substantial evidence.

Asbury owns and maintains a campus on which it has constructed the Asbury Village Apartments, three buildings with 393 units housing approximately 500 senior citizens, the Asbury Methodist Home, a 180–person residential facility for elderly Methodists and for Apartment residents who require domiciliary services and intermediate nursing care, and the Herman M. Wilson Health Care Center, a 279–bed medical facility which provides intermediate and skilled nursing care for the Home and Apartment residents and elderly patients from the surrounding community. Prior to 1983, all three facilities were exempt from Maryland real property taxes. To be exempt, Md.Code Ann. Art. 81, § 9(e)(2) requires that the property be owned by a nonprofit charitable organization and be "actually used exclusively for and necessary for charitable ... purposes ... in the promotion of the general public welfare of the people of the State." Contrary to past determinations, the Supervisor assessed the Apartments for taxes for the 1983–84 tax year.[1] The Property Tax Assessment Appeal Board for Montgomery County reversed the Supervisor's assessment and granted the exemption.

The Supervisor appealed to the Maryland Tax Court contending that the Apartments were not used for a charitable purpose as required by § 9(e)(2) because providing nonprofit housing for the elderly was not charitable. The tax court concluded from the facts presented that Asbury's three facilities, the Home, the Health Care Center, and the Apartments, function as an integrated whole. On that basis, the tax court determined that the Apartments satisfied the test for tax exemption under § 9(e)(2) because they were "actu-

---

1. The Supervisor determined the Home and Health Care Center were exempt from taxation and thus the tax status of these facilities is not at issue.

ally used exclusively for and necessary for charitable ...
purposes...."

The Supervisor moved for a reconsideration on the basis
of an opinion the Circuit Court for Montgomery County had
rendered in *Friends House, Inc. v. Supervisor of Assess-
ments of Montgomery County*, Civil No. 0099 (1985).
*Friends House, Inc.*, which was rendered after the tax
court's first hearing in the case *sub judice*, involved the tax
exemption status of property used as housing for the el-
derly. The tax court had denied a tax exemption to Friends
House and the circuit court had affirmed holding that "it is
not charitable to provide low-cost housing to those who do
not need financial assistance, whether they are young or
old." The Supervisor argued to the tax court at its recon-
sideration of the instant case that *Friends House, Inc.*
controlled the result in this case.

After a second hearing in the case *sub judice*, the tax
court revised its opinion and denied Asbury a tax exemption
for the Apartments. In its Memorandum of Grounds for
Decision, the tax court did not reconsider its original find-
ings of fact or make new ones. It simply reasserted that
the Apartments are operated at no profit to Asbury and
that the entrance fees charged to Apartment residents "are
used to repay the construction loan to [Asbury's] capital
fund and could be used to subsidize apartment residents
who are unable to pay full charges." The tax court quoted
from the circuit court's recent holding in *Friends House,
Inc.* that provision of low-cost housing to the elderly is not
charitable, and concluded, therefore, that the Apartments
are not used for a charitable purpose. Accordingly, the tax
court ordered the tax exemption denied. Asbury appealed
the tax court's decision to the circuit court which reversed
the decision, ruling that the Apartments were exempt from
taxation.[2] The circuit court's ruling against the Supervisor
precipitated this appeal.

---

2. Judge William C. Miller, who was also the author of the *Friends
House, Inc.* opinion, presided over Asbury's appeal to the circuit court.

## I. REVIEW OF TAX COURT DECISIONS

"[J]udicial review of decisions of the Maryland Tax Court is severely limited." *Comptroller of the Treasury v. Mandel, Lee, Goldstein, Burch Re-Election Comm.*, 280 Md. 575, 578, 374 A.2d 1130 (1977); *Supervisor of Assessments of Anne Arundel County v. Southgate Harbor*, 279 Md. 586, 595, 369 A.2d 1053 (1977); *Comptroller of the Treasury, Income Tax Div. v. Diebold, Inc.*, 279 Md. 401, 407, 369 A.2d 77 (1977). Maryland Code Ann. Art. 81, § 299(*o*) (1957, 1980 Repl.Vol., 1986 Cum.Supp.), requires that a reviewing court "shall affirm the Tax Court order if it is not erroneous as a matter of law and if it is supported by substantial evidence appearing in the record." This standard, however, imposes "no statutory constraints" upon the reviewing court in reversing a tax court order "which is premised solely upon an erroneous conclusion of law." *Ramsay, Scarlett & Co. v. Comptroller of the Treasury*, 302 Md. 825, 834, 490 A.2d 1296 (1985).

■ We hold that the circuit court was correct in concluding that the tax court erred as a matter of law. The tax court denied the tax exemption based on its determination that provision of nonprofit housing to the elderly is not charitable. As we explain below, the proper test for determining the tax exempt status of a portion of the property

---

In his decision in the case *sub judice*, Judge Miller distinguished Asbury from the situation in *Friends House, Inc.* on three bases: (1) Asbury provides a life care contract to the Apartment residents and Friends House did not; (2) Asbury Apartment residents, unlike the residents in Friends House, have a financial misfortune guarantee designed to pay the cost of care if they run out of money; and (3) Asbury has institutional financial interdependence among its several facilities. He then explained his decision in *Friends House, Inc.*:

"This Court in its decision in *Friends* stated that 'it is not charitable to provide low cost housing to those who do not need financial assistance, whether they are young or old.' This is, perhaps, an over-generalization. It may have been more appropriate to summarize the *Friends* decision as follows: 'it is not charitable to provide low cost housing and nothing more to the elderly who do not need financial assistance.' "

The circuit court reversed the tax court based on the tax court's misapplication of *Friends House, Inc.* to the case *sub judice*.

owned by a charitable institution is whether the subject property is actually and exclusively used for and necessary for the *charitable purposes of the whole organization.* Considering the use of the Apartments in isolation from the charitable purposes of the Asbury enterprise was error. Thus, the circuit court was correct in substituting its judgment for that of the administrative body under Art. 81, § 229(*o* ). Accordingly, we will affirm the circuit court's decision.

## II.  THE APPLICABLE TEST UNDER § 9(e)(2)

■ The circuit court agreed with the tax court, as do we, that the Legislature intended a narrowing of charitable exemptions when it amended § 9(e) in 1972.  In *Supervisor of Assessments of Baltimore City v. Friends School,* 67 Md.App. 508, 515-16, 508 A.2d 514 (1986), this Court recognized the stricter language of the amended provision in establishing its three-prong test for determining whether property owned by an institution is exempt under § 9(e)(2). *Friends School* dealt with property owned by an educational institution but, since § 9(e) groups together property owned by nonprofit charitable, fraternal, sororal, benevolent, educational and literary institutions, the test from *Friends School* applies equally to property owned by a charitable organization.  The property must be 1) owned by a charitable organization; 2) "actually used exclusively for and necessary for" the charitable purposes of the organization; and 3) used in the promotion of the general public welfare of the citizens. *See Friends School,* 67 Md.App. at 518-19, 508 A.2d 514.  Appellant does not dispute that the Apartments are owned by a charitable organization or that their use promotes the general public welfare.  Appellant focuses only on the second prong of the test.

This Court's opinion in *Friends School* contains a thorough review of the proper analysis under the second prong where, as here, a portion of property is assessed as nonexempt in relation to the remainder of the property of a charitable or educational organization.  In *Friends School,* this Court made it clear that the second prong of the test for exemption under § 9(e)(2) requires that the subject property "be actually used and necessary for the [charitable] *purposes of that institution or organization.*"  67

Md.App. at 518–19, 508 A.2d 514 (emphasis supplied). To determine whether the use to which the subject property is put qualifies for exemption under § 9(e)(2), "the activities that occur in or on the subject property must directly relate to the [charitable] *goals of the institution." Friends School,* 67 Md.App. at 519, 508 A.2d 514 (emphasis supplied). In applying this test to a caretaker's residence located on the property of a day school campus, we concluded in *Friends School* that "no activity either directly or indirectly *related to the educational goals of the school* took place in or on the residence." 67 Md.App. at 521, 508 A.2d 514 (emphasis supplied). We did not review the activities at the caretaker's residence in total isolation from the educational goals of the school. The *Friends School* analysis makes clear that the purpose which the Asbury Apartments must serve, in order to qualify for exemption under § 9(e)(2), must relate to the purpose of the whole Asbury enterprise.

Appellant cites *Lodge # 817, Trustees Benevolent and Protective Order of Elks v. Supervisor of Assessments of Wicomico County,* 292 Md. 533, 439 A.2d 591 (1982), and *Supervisor of Assessments of Baltimore County v. Trustees of Bosley Methodist Church Graveyard,* 293 Md. 208, 443 A.2d 91 (1982), to support an argument that use of the Apartments must be viewed in a vacuum. Both cases, however, support rather than reject our conclusion. In *Lodge # 817,* the Court of Appeals considered whether a golf course situated on property owned by the Lodge was exempt under § 9(e)(2). There, the golf course was not used for any charitable causes. It was available solely for recreational use by members and their guests. *Lodge # 817,* 292 Md. at 535–36, 439 A.2d 591. The Court rejected the argument that, because the golf course served as an inducement for members to participate in charitable events, it was part of the charitable purpose of the whole organization. *Lodge # 817,* 292 Md. at 538–39, 439 A.2d 591. Thus, the Court ruled that the use of the subject property did not serve the charitable purpose of the Lodge as a whole.

*Bosley* is similarly unhelpful to appellant's position. There the Court of Appeals considered whether a caretaker's residence was tax exempt under Md.Code Ann., Art. 81, § 9(c) (1957, 1980 Repl.Vol.), as property "actually used exclusively for public religious worship." [3] The Court determined that the property was not exempt because no religious worship was ever conducted at the caretaker's residence. *Bosley*, 293 Md. at 218–19, 443 A.2d 91. Providing the caretaker with rent-free housing was only ancillary to the religious goal of the whole organization, that is, to hold services for public religious worship. Thus, *Bosley* supports rather than contradicts our construction of the test to be applied when assessing the tax exempt status of a portion of the property belonging to a charitable institution.

Under the second prong of the test enunciated in *Friends School*, we look to whether the Apartments are "actually used exclusively for and necessary for" the charitable purposes of the whole Asbury enterprise. The Supervisor does not dispute that the Corporation serves a charitable purpose. The purpose stated in Asbury's charter is to provide homes for the aged. To achieve this purpose Asbury provides continuing care to the elderly in three different stages: nonprofit apartment-style housing, intermediate nursing care within a domiciliary facility, and a medical facility that provides skilled and comprehensive nursing care. Hence, Asbury meets its charitable purposes through its operation of a low-cost, nonprofit community structured to serve the housing, medical and financial needs of the older members of our society. Having identified Asbury's charitable purposes, the next step is to determine whether the Apartments are "actually used exclusively for and necessary for" these charitable purposes served by the whole Asbury enterprise.

---

3. In contrast to the requirement in § 9(e)(2), that in addition to being used for charitable purposes the property be "necessary for" those purposes, § 9(c) omits the "necessary for" language.

### Actual and Exclusive Use

■ Actual use is determined by looking to the type and frequency of the activity occurring on the subject property. *Friends School,* 67 Md.App. at 519–20, 508 A.2d 514; *see also Bosley,* 293 Md. at 216, 443 A.2d 91. The statutory requirement of "exclusive" use is satisfied where the property is used *primarily* for the charitable purposes of the organization. *Bosley,* 293 Md. at 215 n. 5, 443 A.2d 91; *Friends School,* 67 Md.App. at 514 n. 1, 508 A.2d 514. Our review of the uncontroverted facts leads us to conclude that the Apartments satisfy the actual and exclusive use requirements of § 9(e)(2).

The type of activity occurring at the Apartments is moderate-priced living quarters for persons age 65 and over. When an applicant is accepted to occupy a unit in the Apartments, he or she signs a Resident Agreement. The resident agrees to pay monthly maintenance fees which cover the cost to operate the Apartments,[4] a daily meal in the dining room, laundry facilities and full use of all the public areas on campus for resident activities, at no profit to the Corporation.[5] Peg McRory, who qualified as an expert on housing in Montgomery County, testified that the monthly maintenance charges at the Apartments are comparable to rental rate structures for low- and moderate-income housing in the County. She further testified:

> "... I can state without any reservation whatever that the housing which is provided [at the Asbury Apartments] is moderate income housing, no matter who lives in it. It is moderate priced. The comparable market project that I know of are at such a different range of price that it would curl your hair."

─────────

**4.** Operating expenses include the costs of such services as utilities, building and grounds maintenance, security, social services, employee salaries, debt service, insurance, and administrative expense.

**5.** Harold Wells, the Administrator for the Apartments, gave deposition testimony that was entered into evidence that when a surplus or deficit occurs in any given year, it is budgeted for in the rates the following year so that no profit accrues to Asbury.

Harold Wells, the Administrator for the Apartments, described another use of the Apartments broader than the mere provision of moderate-priced housing. The Apartments provide housing that offers security and fellowship that is often lacking in the resident's previous environment. Wells stated:

"They come seeking a broader range of fellowship and social interaction than they find sometimes in a community in which they may have lived for twenty or twenty-five years, and suddenly find themselves the outsider because of the changes in the socialogical [sic] aspects of our communities.

"They find themselves living in homes which they can no longer care for. They find themselves in apartments in which they are just a loner, so to speak. People come to us when they have been through traumas such as being attacked on the streets. We find all sorts of motivation that lead people to a facility such as ours."

The Apartments provide security to these people in several ways. First, the Apartments are located on a guarded campus separated from the pedestrian traffic in the area. There is no need to travel great distances in order to be involved socially because recreational activities are available on the campus. Amenities available to the residents include maid service and dry cleaning service. There is also a beauty shop and a barber shop located on the campus. Finally, each Apartment unit is specially equipped with a communication system which allows a resident who suffers an injury or health problem immediate access to the assistance of physicians and rescue squads. When necessary, the resident can transfer to the Home for intermediate nursing care or to the Health Care Center for comprehensive health care, both located on the same campus with the Apartments. The resident has priority space at each facility. Asbury also has an agreement with two other local nursing homes where it will temporarily place an Apartment resident in the event that no space is available at Asbury's Home or Health Care Center.

The Apartments also provide for the residents' financial security because Asbury has an established policy set out in the Resident Agreement of maintaining in residence any person who becomes unable to continue independent living in the Apartments, or who can no longer pay the Apartment maintenance charges due to financial misfortune. Appellant argues that this life-care guarantee is not charity for three reasons: first, applicants are only accepted as Apartment residents if they are in good health and thus are unlikely to need health care services from Asbury's other facilities; second, the resident must exhaust all sources of public and private financial assistance before receiving aid from the Corporation; and third, financial assistance will only be provided by Asbury if it does not impair the ability of the Corporation to operate on a sound financial basis.

As to appellant's first complaint, we disagree that simply because the Apartment residents are healthy upon entry they are unlikely to need the other facilities on the Asbury campus. Each resident must be at least 65 years of age, except that a spouse may be only 60 years old. Healthy at age 60 to 65 is not commensurate with healthy at age 25. The residents are beginning their declining years. While some may live in reasonably good health for 30 more years, most can be expected to suffer health problems requiring medical care in the near future. In fact, the Health Care Center has been operating only since late 1980, and in 1982 eight percent of its patients were from the Apartments.

As to appellant's second and third concerns, the conditioning of the financial misfortune clause on an exhaustion of resources and the financial posture of the Corporation also does not detract from the charitable use of the Apartments. Both requirements are simply sound business policy for any charity. Requiring residents to exhaust other resources prior to receiving financial aid from the Corporation limits those who will drain corporate funds to the most needy. Moreover, the Resident Agreement specifically provides:

"During the time that the Resident continues to reside in the Asbury Methodist Village Apartment Community and

is unable to meet the full monthly maintenance charge, the Corporation will absorb the difference between the amount of such monthly maintenance charge and the amount paid by the Resident, and will not pass through any resulting deficit to the other apartment Residents."

In this way, Asbury can continue to offer moderate-priced housing to other elderly persons in the County.

It would further be illusory for Asbury to promise that the Corporation will provide financial aid to those persons whose resources have been depleted regardless of the financial soundness of the Corporation. If Asbury were to make such a guarantee and financial support of too many residents caused the Corporation to operate in a deficit, eventually the Corporation would be unable to provide housing and care for any of its residents.

In addition, the Resident Agreement, while it conditions financial aid to the Apartment residents, does not give Asbury the right to remove the resident from the campus when the resident cannot pay his or her charges. The Agreement provides that

"continued inability to meet the monthly maintenance charge may cause severe hardship as to the future financial structure of the Apartments, therefore, the Corporation reserves the right, after consultation with the Resident's family, to *transfer the Resident to whatever other facility located within Asbury Methodist Village* that will best meet the needs and situation of the Resident." (Emphasis supplied.)

In total, the Resident Agreement guarantees continued care to the Apartment residents, thus relieving them of apprehension regarding their future health and financial needs. These policies also allow Asbury the flexibility to remain a viable entity serving the needs of all its residents without having to turn its back on those with depleted assets.

### Necessity of Apartments

The final step is to determine whether the Apartments are "necessary for" the charitable purposes of the whole

Asbury enterprise. Art. 81, § 9(e)(2). In determining in *Friends School* that the caretaker's residence was not necessary for the purposes of the educational institution, we looked to the type of organization, the needs of the people it served, the location of the organization, the proximity of the property under review to the remainder of the organization's facilities, and the ability of the organization to perform its charitable function without use of the subject property under review. 67 Md.App. at 520, 508 A.2d 514. We review those same considerations in the case *sub judice.*

Asbury is much more than a retirement village; it provides a continuum of care for the elderly, serving their needs from the time they are reasonably healthy and financially stable through periods of impaired health and depleted assets. The Apartments are located in Montgomery County, which has an inadequate supply of moderate-priced housing for the elderly.[6] The location of the Apartments on a campus with Asbury's other facilities allows the organization to provide for the recreation and health care needs of the Apartment residents.

It is Asbury's offering of this total package of services that attracts persons over age 65 who have enough assets to afford the Apartment entrance fees.[7] In turn, the money collected from the entrance fees enables the organization to continue providing services at the Home and Health Care

---

6. Peg McRory, a housing expert and consultant to the Montgomery County Council, testified that the supply of housing in Montgomery County is inadequate, and that the Federal government is not providing for new housing, but rather is cutting funding. She cited a recent study of the Park and Planning Commission indicating that between 1980 and 1990, the elderly population of Montgomery County will increase 48 percent, and the female elderly population over 75 will increase 85 percent. McRory also testified that there are 3,500 applications on the Housing Opportunities waiting list for housing for the elderly in Montgomery County. Representatives from Asbury testified that over 1300 people are on the waiting list for the Apartments, resulting in a minimum five-year wait between the time of application and acceptance for occupancy.

7. In 1982, the residents paid entrance fees ranging from $21,000 to $43,800, depending on the size of the unit occupied.

Center for elderly persons and Medicaid patients [8] from the surrounding community, along with Apartment residents who have suffered financial misfortune. In this way, the Apartments are necessary for the charitable purposes of the whole Asbury enterprise.

During the 1983–84 tax year under review, on paper the entrance fees charged to the Apartment residents were being used to repay the loan from the Corporation which had been used to fund construction of the Apartments. While the entrance fees were applied to pay debt service, the payments went into the Corporation's capital fund. That fund in turn funded operating deficits from the Home and Health Care Center,[9] the repair of worn-out equipment, and the building of new facilities, such as a new home which was under construction as of the date of the hearing in this case.

Once the Apartment debt service is paid, the entrance fees collected will provide the Corporation with additional funding reserves. These reserves will allow the Corporation to expand to meet the increasing demand for housing and medical services for the elderly.[10] These fees will also establish the endowment used to subsidize deficits at the other facilities and Apartment residents requiring financial aid. In addition, without the entrance fees from the Apartments, the level of Asbury's endowment would be dependent on charitable contributions or government funding re-

---

**8.** The Health Care Center admits an unlimited number of Medicaid patients. At the time of the hearing before the tax court, 60 percent of the Health Care Center's occupants were on Medicaid, which does not meet the full cost of care. In addition, the Corporation was subsidizing 40 percent of the Home residents.

**9.** The Health Care Center ran a deficit of $160,082 in 1980 and $80,423 in 1981. The Home ran a deficit of $61,238 in 1980, $132,001 in 1981 and $137,834 in 1982. The Corporation subsidized the losses of these facilities.

**10.** *See supra* n. 7.

ceived in any given year.[11]  We conclude from this evidence that the Apartments are "necessary for" the charitable purposes of the whole Asbury enterprise.[12]

### III.  CONCLUSION

Asbury's provision of apartment housing facilities with a life-care commitment, relieving the fear of exhausted life's savings, is clearly a charitable use of property.  The entrance fees and the charges for services do not undermine the claim of exemption.  Rather, they are demonstrably designed to maximize the ability of the Corporation to provide all of the services of the Asbury community to the greatest number of elderly and to expand those services and facilities while the need exceeds the supply.  The Apartments cannot be divorced from the remainder of the complex either financially or from the perspective of the Apartment residents who have sought the commitment to life care and the services of the other facilities at the outset. We hold that the Apartments are "actually used exclusively for and necessary for" the charitable purposes of the whole Asbury enterprise, and were tax exempt under § 9(e)(2) for the 1983–84 tax year.

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANT.

---

**11.**  For example, in 1981 the Corporation received over $1.5 million in gifts and bequests but only slightly more than $600,000 in 1982.

**12.**  Ms. McRory, who qualified as an expert on housing in Montgomery County, opined that Asbury was a unique and ingenious way of providing housing for the elderly.  She testified:

"It is a way of persuading people who have some money to put back money, to use to create housing for people who have less money.... And this is done without government intervention.  The normal way of raising financing money from the rich is through tax exempt bonds, or why [sic] syndication or other complicated and somewhat obscure ways of converting wealth into housing.  This is a very up front, straight forward, on the table way of the [sic] persuading people to put their money down; and then create housing.

\*    \*    \*    \*    \*    \*

"... I'd like to see not one, but dozens of such enterprises."