547 A.2d 190

**SUPERVISOR OF ASSESSMENTS OF
MONTGOMERY COUNTY**

v.

**ASBURY METHODIST HOME, INC.**

**No. 155, Sept. Term, 1987.**

Court of Appeals of Maryland.

Sept. 16, 1988.

Motion for Reconsideration Denied Oct. 31, 1988.

Kaye Brooks Bushel, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Jane E. Pilliod, Asst. Atty. Gen., all on brief), Baltimore, for appellant.

James L. Thompson and Joseph V. Truhe, Jr. (Miller, Miller & Canby, all on brief), Rockville, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS, JJ., and MARVIN H. SMITH, Associate Judge of the Court of Appeals of Maryland (retired) Specially Assigned.

MURPHY, Chief Judge.

The issues in this case arise from a Maryland Tax Court decision denying exemption from property tax for the 1983–84 tax year to three apartment buildings for elderly residents, which were owned and operated by a nonprofit, charitable corporation.

I

The record before us discloses that, in 1926, the Baltimore Conference of the Methodist Episcopal Church South built a home for the Conference's elders in Gaithersburg, Maryland. The home, known as the Asbury Methodist Home, opened its doors to five residents, grew quickly to its initial capacity of 70 residents, and after renovation and expansion in the 1950s reached a capacity of 175 residents. By this time the home had been incorporated as the Asbury Methodist Home, Inc. (the Corporation), a nonprofit organization dedicated, according to its articles of incorporation, exclusively to the charitable purposes of providing homes for aged members of the Conference and such other members of society as space would permit. In the 1970s the Corporation began to build other facilities, in addition to the home, on the 128 acres of land it owned in Gaithersburg, as it expanded into what is now known as the Asbury Methodist Village. The first wing of a health center was erected in the mid–1970s; the second half of the center was completed in 1981. Three buildings, known as the Asbury Apartments, were erected in 1972, 1977, and 1980. Thus, as of the end of 1982, the Asbury Village campus comprised three basic facilities: the home, which, providing domiciliary care only, housed approximately 175 residents in older style single room accommodations with shared baths; the health center, a 279 bed facility providing comprehensive and modern nursing care; and the three modern eight story apartment buildings, containing 393 apartment units, which altogether housed approximately 500 residents. Applicants

to the home and health center, but not to the apartments, were eligible for admission regardless of ability to pay.[1]

Until 1983, the Asbury Apartments, along with the home and the health center, enjoyed a real property tax exemption under Maryland Code (1957, 1980 Repl.Vol.) Art. 81, § 9(a) and (e).[2] These subsections provided, in pertinent part:

"(a) ... The following real and tangible personal property are exempt from assessment and from State, county, and city ordinary taxation, except as otherwise stated, which exemptions shall be strictly construed:

. . . .

(e) ... Property owned by ... (2) any nonprofit charitable, fraternal or sororal, benevolent, educational, or literary institutions or organizations when ... actually used exclusively for and necessary for charitable, benevolent, or educational purposes (including athletic programs and activities of an educational institution) in the promotion of the general public welfare of the people of the State."

In early 1983 the State Department of Assessments and Taxation (SDAT), as part of a review of the taxation of all nonprofit nursing home facilities in Maryland, examined the Asbury Apartments' tax exempt status. Reasoning that the Corporation needed to justify the exemption for the apartments separately and not by reference to the home and health care facilities, and that the apartments when viewed separately did not meet the statutory requirements for exemption, SDAT concluded that the apartments should be taxable.[3] The Supervisor of Assessments of Montgomery County, the appellant in this case, was directed to

---

1. In 1982 approximately 40% of the residents in the home received some measure of subsidy from the Corporation.

2. Now codified as Code (1986), § 7–202 of the Tax–Property Article.

3. Both the home and health center continued to enjoy tax exemption. Their tax exempt status has not been challenged.

assess property tax on the apartments beginning July 1, 1983.

The Corporation appealed the assessment to the Property Tax Assessment Appeals Board for Montgomery County, which reversed. The Supervisor then appealed to the Maryland Tax Court. That agency in August 1984 conducted an evidentiary hearing. Most of the basic facts concerning the apartments adduced at the hearing were uncontroverted [4]; they showed that to be eligible for entrance to the apartments, applicants were required to be age 65 or over (a spouse of a qualifying applicant could be as young as 60) and to have letters of recommendation from their pastor, priest, or rabbi. A physical examination was necessary immediately before admission. Admission policy was not to admit those who needed nursing care prior to admission, though apartment residents had priority for admission to the health care center if the need for nursing care arose after they had occupied the apartments. They were, however, expected to pay their own costs at the health center. At the end of 1982 about 8% of the residents at the health center had come from the apartments; about 17% from the home; and about 75% from the general public.

Financial requirements for admission to the Asbury apartments included an entrance fee, which varied with the size of the apartment, and a monthly maintenance charge. Entrance fees in 1982 ranged from $21,000 for a single studio apartment to $43,800 for a large two bedroom apartment. In 1982, the monthly charge, which covered utilities, food service (one meal each day), maintenance of buildings and grounds, and various other operating expenses, ranged from $323 for one person in a small studio apartment to $659 for two persons in a large two bedroom apartment. The monthly charge was calibrated from year to year to equal the total operating costs; consequently, there was

---

**4.** These factual statements describe the apartments as of the end of 1982, when the SDAT gathered the data on which it based its decision to withdraw the apartments' exemption.

neither profit nor loss from the operation of the apartments. The apartments received little support from charitable contributions.[5]

The contract between the Corporation and the apartment resident contained a "Financial Misfortune" provision, which stated:

"If, through financial misfortune, beyond the control of the Resident, a Resident becomes unable to meet the monthly maintenance charges, health care costs and living costs, then the Corporation agrees to provide for the necessary housing, health care and financial assistance for the Resident at no charge, or partial charge depending upon individual circumstances, so long as the Resident continues to be a resident of the Asbury Methodist Village and the Resident needs this financial assistance, provided such assistance does not impair the ability of the Corporation to operate on a sound financial basis and maintain the facilities for other Residents. The Resident agrees to exhaust all sources of public and private financial assistance as a condition precedent to requesting or being granted financial assistance by the Corporation. During the time that the Resident continues to reside in the Asbury Methodist Village Apartment Community and is unable to meet the full monthly maintenance charge, the Corporation will absorb the difference between the amount of such monthly maintenance charge and the amount paid by the Resident, and will not pass through any resulting deficit to the other apartment Residents. Such continued inability to meet the monthly maintenance charge may cause severe hardship as to the future financial structure of the Apartments, therefore, the Corporation reserves the right, after consultation with the Resident's family, to transfer the Resident to whatever other

---

5. In 1982 charitable contributions to the apartments amounted to $1,285. Charitable contributions to the home and health center, by contrast, were approximately $415,000 and $194,000, respectively.

facility located within Asbury Methodist Village that will best meet the needs and situation of the Resident." As of 1982, no resident of the apartments had ever invoked the protection of this provision.

Construction of the apartments was financed by a loan, with an interest rate of approximately 6%, from the Corporation's capital fund. This fund had been accumulated over the years from various sources, including donations. The money received by the Corporation as entrance fees to the apartments was first, as an accounting matter, segregated into the apartments' capital fund; from there it was paid to the Corporation's capital fund as debt retirement, becoming available as part of the Corporation's total capital. This total capital was then available for such things as major repairs for all the Corporation's facilities, construction, and for subsidizing deficits from the home and health center, both of which operated at a loss.

In its December 1984 decision the Tax Court said that the question before it was whether the apartments "fall within the category of property owned by a charitable institution which is actually used exclusively for and necessary for charitable ... purposes." It noted that the Corporation's facilities provided continuing care to the aged in three different stages: "(1) nonprofit apartment housing for those who are self-sufficient, (2) intermediate nursing care or domiciliary services and (3) comprehensive care/medical facility." The Tax Court said that the "entrance fees [to the apartments] are used to repay the loan from the Home's capital fund that was used to construct the Apartments, to fund operating deficits at the other two parts, the Home and the Health Care Center, and to subsidize apartment residents who are unable to pay full charges." It concluded that "taking the three-pronged functions of ... [the Corporation's] facilities as an integrated whole," the apartments were tax-exempt under § 9(e) for the 1983–84 tax year.

The Supervisor moved for reconsideration. After hearing argument, the Tax Court in July 1985 issued a new order reversing the Board's decision, thus denying the apart-

ments' exemption.  In its memorandum on reconsideration, the Tax Court again stated that the issue was whether the apartments were actually used exclusively for and necessary for charitable purposes, as required by Article 81, § 9(e).  Summarizing the facts, the Tax Court concluded that the "entrance fees are used to repay the construction loan to the Home's capital fund and could be used to subsidize apartment residents who are unable to pay full charges."  The Tax Court noted the position of the Supervisor

> "that so far no residents have been in financial need and that the apartment does not contribute to the funding of operating deficits of the other two facilities, since the entrance fees are merely repaying a loan from the endowment fund."

It noted further that the Supervisor challenged the Tax Court's earlier finding "that the apartment complex forms an integral part of the overall operation."  The Tax Court then observed that between the time of the first hearing and that on Reconsideration, the Circuit Court for Montgomery County issued its opinion in *Friends House, Inc. v. Supervisor of Assessments of Montgomery County,* Civil No. 0099 (1985), a case involving similar questions of entitlement to tax exemption.  The Tax Court observed that in *Friends* the circuit court, which affirmed the Tax Court's denial of the tax exemption, stated that "it is not charitable to provide low-cost housing to those who do not need financial assistance, whether they are young or old."  The Tax Court stated that

> "[t]he arguments presented by [the Supervisor], and the recent decision in the *Friends* case, have convinced us that the apartments should not be exempt from the property tax."

The Corporation appealed to the Circuit Court for Montgomery County, which reversed and ordered the Supervisor to grant the exemption.  In a memorandum opinion by Judge Miller, who was the author of the *Friends* opinion, the court stated that "[t]he Asbury Apartment entrance

fees are also used to fund operating deficits at the Home; to fund operating deficits at the Health Care Center; and to provide for apartment residents who are unable to pay their monthly maintenance fees." The circuit court further found that "Asbury Apartment residents are provided with a life care contract which protects residents who are no longer financially able to pay monthly maintenance fees and expenses." As to the statement in *Friends* that it was not charitable to provide low-cost housing to those not needing financial assistance, the court said:

> "This is, perhaps, an overgeneralization. It may have been more appropriate to summarize the *Friends* decision as follows: 'it is not charitable to provide low cost housing and nothing more to the elderly who do not need financial assistance.'"

In the circuit court's view, the apartments were "an integral part of Asbury's life care contract with its elderly," which provided not only housing but also health care and financial security to aged persons. The apartments were therefore found by the court to be tax-exempt under § 9(e). It concluded that the Tax Court's contrary ruling was erroneous as a matter of law.

The Supervisor appealed to the Court of Special Appeals, which affirmed. *Supervisor v. Asbury Methodist Home,* 72 Md.App. 352, 529 A.2d 852 (1987). The intermediate appellate court held the circuit court was correct in concluding that the Tax Court erred as a matter of law. Citing its prior decision in *Supervisor of Assessments of Baltimore v. Friends School,* 67 Md.App. 508, 508 A.2d 514, *cert. granted,* 307 Md. 342, 513 A.2d 911 (1986), the court stated that "the proper test for determining the tax exempt status of a portion of the property owned by a charitable institution is whether the subject property is actually and exclusively used for and necessary for the *charitable purposes of the whole organization.*" 72 Md.App. at 356–57, 529 A.2d 852 (emphasis in original). According to the court, *Lodge # 817, Order of Elks v. Supervisor,* 292 Md. 533, 439 A.2d 591 (1982), in which we held that a golf course owned

by a nonprofit fraternal organization was not entitled to tax exemption under § 9(e), and *Supervisor v. Trs., Bosley Meth. Ch.*, 293 Md. 208, 443 A.2d 91 (1982), in which we held that real estate owned by a religious organization for use as a caretaker's residence was not tax exempt under Article 81, § 9(c),[6] supported rather than contradicted its position that, as a matter of law, it was error to view the apartments separately from the Asbury Village's other facilities. The court concluded that the apartments' purposes and those of the Corporation were the same. It reasoned that since the Corporation's purposes, as expressed in its charter, were clearly charitable, the only remaining question concerned whether the apartments were "actually used exclusively for and necessary for" these purposes. With respect to the actual and exclusive use elements, the court, prior to summarizing the testimony presented at the Tax Court hearing, stated that its "review of the uncontroverted facts leads us to conclude that the Apartments satisfy the actual and exclusive use requirements of § 9(e)(2)." *Id.* 72 Md.App. at 360, 529 A.2d 852. Turning to the requirement that the apartments be "necessary for" the identified charitable purposes, the court weighed the factors it had set forth in *Friends School, viz.,*

"the type of organization, the needs of the people it served, the location of the organization, the proximity of the property under review to the remainder of the organization's facilities, and the ability of the organization to perform its charitable function without use of the subject property under review." *Id.* at 364, 529 A.2d 852.

The court concluded:

"Asbury is much more than a retirement village; it provides a continuum of care for the elderly, serving their

---

6. Article 81, § 9(c) provides:

"(c) *Churches.*—Property owned by a religious group or organization and actually used exclusively for public religious worship, including parsonages and convents, and property owned by any such group or organization and actually used exclusively for educational purposes."

needs from the time they are reasonably healthy and financially stable through periods of impaired health and depleted assets.... The location of the Apartments on a campus with Asbury's other facilities allows the organization to provide for the recreation and health care needs of the Apartment residents.

"It is Asbury's offering of this total package of services that attracts persons over age 65 who have enough assets to afford the Apartment entrance fees. In turn, the money collected from the entrance fees enables the organization to continue providing services at the Home and Health Care Center for elderly persons and Medicaid patients from the surrounding community, along with Apartment residents who have suffered financial misfortune. In this way, the Apartments are necessary for the charitable purposes of the whole Asbury enterprise." *Id.* at 364–65, 529 A.2d 852 (footnotes omitted).

Finally, the court stated that while "on paper" the apartment entrance fees were being used to repay the construction loan from the corporation,

"the payments went into the Corporation's capital fund. That fund in turn funded operating deficits from the Home and Health Care Center, the repair of worn-out equipment, and the building of new facilities....

"Once the Apartment debt service is paid, the entrance fees collected will provide the Corporation with additional funding reserves. These reserves will allow the Corporation to expand to meet the increasing demand for housing and medical services for the elderly." *Id.* at 365, 529 A.2d 852. (footnotes omitted).

Having determined that the actual use, exclusive use, and "necessary for" requirements were satisfied, the court held that the apartments were tax exempt under § 9(e).

The Supervisor petitioned for certiorari, questioning whether on the present facts the apartments are entitled to tax exemption. We granted certiorari to consider this important question.

To resolve the issues presented in this case we must first decide whether, when applying § 9(e), the apartments are to be viewed as a necessary component of the Asbury Methodist Village complex and therefore as sharing in the charitable purposes of the home and health center, as the Corporation asserts and the circuit court and Court of Special Appeals held; or whether the apartments must pass muster under § 9(e) separately and without reference to the other facilities in the Village, as the Supervisor contends and the Tax Court ultimately held. Second, having determined our focus, we must decide whether the several requirements imposed by § 9(e) have been satisfied. Intertwined with both questions are issues involving the proper standard of review of a Tax Court decision. We turn first to these issues concerning the standard of review.

## II

Article 81, § 229(*o* ) provides, with respect to appeals from the Tax Court, that the circuit court "shall determine the matter upon the record made in the Maryland Tax Court ... [and] shall affirm the Tax Court order if it is not erroneous as a matter of law and if it is supported by substantial evidence appearing in the record." The narrow bounds imposed by this provision on judicial review of Tax Court decisions apply to this Court and the Court of Special Appeals as well as to the circuit courts. *Supervisor v. Group Health Ass'n*, 308 Md. 151, 156, 517 A.2d 1076 (1986). The provision's substantial evidence test is the same as that used for judicial review of other administrative agencies, *Balto. Lutheran High Sch. v. Emp. Sec. Adm.*, 302 Md. 649, 660–61, 490 A.2d 701 (1985); *Fairchild Hiller v. Supervisor*, 267 Md. 519, 521, 298 A.2d 148 (1973). This test "requires restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclusions," *Insurance Comm'r v. Nat'l Bureau*, 248 Md. 292, 309–10, 236 A.2d 282 (1967); and judicial review must be limited to determining whether a reasoning mind could have reached the factual conclusion reached by the agency, *Ram-*

*say, Scarlett & Co. v. Comptroller,* 302 Md. 825, 834, 490 A.2d 1296 (1985); *Comptroller v. Diebold, Inc.,* 279 Md. 401, 407, 369 A.2d 77 (1977). Application of the test, therefore, must not result in substitution of judicial judgment for agency judgment. *Comptroller v. Haskin,* 298 Md. 681, 693–94, 472 A.2d 70 (1984); *Bulluck v. Pelham Woods Apartments,* 283 Md. 505, 512–13, 390 A.2d 1119 (1978). Moreover, it is "the province of the agency to resolve conflicting evidence, [and] where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences." *Bulluck, supra,* at 513, 390 A.2d 1119, quoted in *St. Leonard Shores Joint Ven. v. Supervisor,* 307 Md. 441, 447, 514 A.2d 1215 (1986).

Under § 229(*o* ), when the Tax Court's order is premised *solely* upon an erroneous conclusion of law, the reviewing court may substitute its judgment for that of the Tax Court. *Ramsay, Scarlett, supra,* 302 Md. at 834, 490 A.2d 1296. Thus, in *Washington Nat'l Arena v. Comptroller,* 308 Md. 370, 519 A.2d 1277 (1987), we considered the question whether under Article 81, § 402 a single charge covering admission to events, parking and club membership may be allocated, for admission tax purposes, between the sum apportionable to admission and the sum apportionable to the other items. In deciding this question, the Tax Court, in its final summation, stated that "on a reading of the statute itself, the Court finds itself in a position that we have to interpret the law. And in interpreting the law we do not ... feel that we can grant any relief." This language, we said, demonstrated that the Tax Court held that no allocation was permissible as a matter of law. Accordingly, application of the deferential substantial evidence test was not appropriate. In *Supervisor v. Chase Associates,* 306 Md. 568, 510 A.2d 568 (1986), the principal issue for review was whether Article 81, §§ 19(a)(1) and 232(8)(d)(2) authorized a mid-cycle reassessment of a certain residential apartment building. We held that the issue involved the proper interpretation of two statutory provisions and was therefore solely a question of law. Consequently, we held,

the Tax Court's interpretation was entitled to no presumption of correctness; rather, the reviewing court was to apply the law as it understood it to be. We reached similar conclusions, thus allowing the reviewing court to substitute its judgment for that of the Tax Court, in *Supervisor of Assessments v. Carroll,* 298 Md. 311, 469 A.2d 858 (1984), and *Comptroller v. Mandel Re-election Com.,* 280 Md. 575, 374 A.2d 1130 (1977). In *Carroll,* we found that the Tax Court had applied the wrong legal standard when making its decision. In *Mandel,* as in *Chase Associates,* we found that the controlling question was essentially one of statutory construction.

When, on the other hand, the Tax Court's decision is based on a factual determination, and there is no error of law, the substantial evidence test applies. *Group Health Ass'n, supra,* 308 Md. at 156–61, 517 A.2d 1076; *Ramsay, Scarlett, supra,* 302 Md. at 834, 490 A.2d 1296. Moreover, the test is appropriate even in the absence of a factual dispute, when the only question is whether the Tax Court, having a correct understanding of the law, properly applied the law to the facts. *Group Health Ass'n, supra,* 308 Md. at 157–58, 517 A.2d 1076; *Ramsay, Scarlett, supra,* 302 Md. at 837, 490 A.2d 1296. *Group Health Ass'n* and *Ramsay, Scarlett* illustrate these principles. In *Group Health Ass'n,* the question before us was whether a nonprofit health maintenance organization (HMO) is a "charitable organization" under Article 81, § 9(e)(2), the very section at issue in the case *sub judice.* The salient facts concerning GHA, the HMO in question, were undisputed. We nonetheless rejected GHA's contention that the determination of its charitable status was a question of law. Employing the substantial evidence test, we found that the Tax Court considered the correct factors in ruling that GHA was not a charitable organization and that substantial evidence supported the Tax Court's decision. In *Ramsay, Scarlett* the issues concerned whether the various in-state and out-of-state business activities engaged in by Ramsay, Scarlett constituted a "unitary business" for purposes of

assessing corporate income tax liability. The Tax Court, using tests approved by this Court in an earlier case, determined that Ramsay, Scarlett was not a unitary business. The Court of Special Appeals found that solely a question of law was involved, thereby justifying a substitution of judgment standard of appellate review. We held this to be error. As we viewed the matter, the crux of the dispute concerned not the law governing the case, but the law's application to the particular facts. Moreover, agency expertise was involved in determining whether the evidence showed Ramsay, Scarlett to be a unitary business. Consequently, the appropriate standard of review was whether a reasoning mind, having a proper understanding of the relevant law, could have reached the conclusion reached by the Tax Court.

■ In this case, somewhat anomalously, both parties contend that the substantial evidence test should apply to the Tax Court's decision. The parties differ, however, as to which of the two Tax Court decisions the test should apply to. The Supervisor argues that it is the second decision. The Corporation maintains that the Tax Court's finding in its first withdrawn decision that the apartments formed an integral part of the Asbury Village survived the Tax Court's subsequent decision. The Corporation asserts that this finding is therefore entitled to deferential review. The Corporation's position is hardly tenable. The only order that was final and appealable was the second one, and that is the one we now consider. *See Yarema v. Exxon Corp.*, 305 Md. 219, 241, 503 A.2d 239 (1986). The prior order and memorandum are relevant only insofar as they shed light on the meaning of the Tax Court's final order and memorandum.

The Supervisor's view is the correct one. As we will later explain, the deferential substantial evidence standard applies to both of two basic holdings contained in the Tax Court's ultimate decision.

## III

We turn to the question of whether, in identifying the apartments assertedly charitable purpose, we are to view them separately or as an "integral" part of the Asbury Village complex. We begin with the legal principle set down by the Court of Special Appeals in resolving this question. That court held, as earlier mentioned, that "the proper test for determining the tax exempt status of a portion of the property owned by a charitable institution is whether the subject property is actually and exclusively used for and necessary for the *charitable purposes of the whole organization."* 72 Md.App. at 356–57, 529 A.2d 852 (emphasis in original).

We think the Court of Special Appeals was wrong in its assessment of the correct rule. Certainly in most cases controlled by § 9(e) the only charitable purpose on which to predicate the subject property's exemption will be that of the encompassing organization. There is, however, no necessity that this always be the case. Charitable activities and facilities come in diverse forms. It may happen that large scale charitable organizations encompass facilities or activities that themselves are arguably charitable on a rationale different from that of the encompassing organization. In such instances the component facility or activity may seek exemption under § 9(e) on either of two grounds: first, that it is instrumental in the manner required by § 9(e) to the charitable purposes of the encompassing organization; second, that its own purposes, viewed separately, are charitable.[7] The case before us is such an instance.

---

**7.** The Court of Special Appeals, in stating that *Lodge # 817* and *Bosley* supported the legal rule it articulated, misread those cases. Neither supports such a rule. In *Lodge # 817* we considered whether an exemption for the golf course could be justified either by the golf course's own allegedly benevolent purposes or by the benevolent purposes of the Lodge as a whole; we rejected both rationales. We did hold that *if* the exemption is predicated on the charitable purposes of the encompassing organization, it is not enough merely to show that the subject property is owned by the encompassing organization; rather, the subject property must meet all requirements imposed by

The Corporation had two rationales for the apartments' exemption: first, that the apartments were actually and exclusively used for and were necessary for the charitable purposes of the Asbury Village complex as a whole; second, that the apartments, viewed separately, achieved the assertedly charitable purpose of providing moderately priced housing for the aged.

The Tax Court recognized these two distinct rationales, and rejected both. It did not clearly articulate the legal basis for rejecting the first rationale, stating only the factual predicate that since the apartments' entrance fees repaid a loan from the endowment fund, the apartments did not contribute to funding operating deficits at Asbury's other facilities and therefore did not form an integral part of the overall operation.[8] It rejected the second because, as it stated, quoting the *Friends* opinion, "it is not charitable to provide low-cost housing to those who do not need financial assistance, whether they are young or old." We defer discussion of the second holding until Part IV, turning

---

§ 9(e). *Lodge #817*, 292 Md. at 538–41, 439 A.2d 591. In *Bosley* we had no occasion to consider whether a component facility must predicate its exemption on the charitable purposes of the larger organization, because there were no plausible grounds for the caretaker's residence in that case to be granted an exemption on its own.

**8.** It is apparent that the court relied on the rule adopted from the *Friends* opinion that "it is not charitable to provide low-cost housing to those who do not need financial assistance, whether they are young or old." It would have made little sense, however, for the court to rely on this rule unless it had decided to view the apartments separately, since, if the apartments were viewed as part of the Village complex, more than "low-cost housing to those who do not need financial assistance" was being provided. Further, the Tax Court stated that the arguments presented by the Supervisor "have convinced us that the apartments should not be exempt." The only arguments by the Supervisor mentioned in the Tax Court's ultimate decision are those urging that the apartments not be viewed as an integral part of the Village complex. We therefore reject the Corporation's contention that the Tax Court's finding in its first decision, that the apartments formed an integral part of the complex, somehow survived the court's revision of its views in the second memorandum.

our attention now to the Tax Court's rejection of the first rationale.

At the outset we hold, in accord with our prior cases, that the deferential standard of review is appropriate. Manifestly, the law applied by the Tax Court was that articulated in the provisions of § 9(e). It was to determine whether the apartments were actually and exclusively used for, and necessary for, the charitable purposes of the Village complex.[9] The critical elements were whether the apartments were actually used for and necessary for these charitable aims; when fleshed out in the relevant facts, this became primarily a question whether the apartment entrance fees were used to subsidize the other facilities in the complex. This question we deem as fact-based and as requiring of agency expertise as that in *Ramsay, Scarlett* concerning whether various activities constituted a "unitary business"; or as that in *Group Health Association* concerning whether a health maintenance organization is a charitable institution. This is so even though the rudimentary facts concerning the use of the entrance fees were undisputed. For as we stated in *Bulluck v. Pelham Woods Apartments, supra,* and have often repeated, "where inconsistent inferences from the same evidence can be drawn, it is for the agency to draw the inferences." The proper standard of review, then, is the substantial evidence test. The circuit court and Court of Special Appeals erred in conducting an independent review of the facts and in substituting their judgment for that of the Tax Court. We must affirm the

---

**9.** Both the circuit court and the Court of Special Appeals treated the inquiry whether the apartments formed an "integral part" of the Village complex as equivalent to the inquiry required by § 9(e) (whether the apartments were actually and exclusively used for and necessary for the charitable purposes of the Village complex). These two inquiries, however, though similar, are not identical. The present case, as discussed above, provides an instance in which a component arguably may be "integral to" yet not "necessary for" the purposes of the larger organization. Circumstances can also be envisioned in which a component facility is "integral to" a larger complex, yet not "exclusively used for" the charitable purposes of the complex, *e.g.,* when the component facility is operated primarily for profit.

Tax Court's decision if it was not erroneous as a matter of law and was supported by substantial evidence.

We see no error of law. The Tax Court's decision is fully consonant with our opinions in *Lodge # 817* and *Bosley*, which involved analogous questions. In *Lodge # 817* the golf course owned by a lodge of the Elks fraternal organization was located on fifty-seven acres of a sixty-six acre parcel; the remaining nine acres were used by the lodge for various charitable activities. The golf course was available only to lodge members and guests. The lodge contended, *inter alia*, that the availability of the golf course to the members acted as an inducement to their sponsorship of the lodge's charitable activities. The lodge thus made an argument similar to that advanced in the present case by the Corporation, *i.e.*, it argued that the golf course was instrumental to the encompassing charitable purposes of the lodge. We rejected this contention. We stated

"that the Lodge's primary purpose may be benevolent does not per se afford an exemption for all its property. Nor does the mere fact that the Lodge may own property used to promote charitable activities render all its property tax exempt. Under the statute, only that property of the Lodge which is 'actually used exclusively for and necessary' for its charitable or benevolent purposes in the promotion of the public welfare is tax exempt." *Lodge # 817*, 292 Md. at 539, 439 A.2d 591.

Distinguishing *Md. State Fair v. Supervisor*, 225 Md. 574, 172 A.2d 132 (1960), which we noted involved an earlier and less exacting version of § 9(e), we held that the golf course did not meet § 9(e)'s requirements.

We reached a similar conclusion in *Bosley*. In that case we interpreted Article 81, § 9(c),[10] which exempts property owned by a religious organization and actually used exclusively for public religious worship. Noting that the several exemptions from property tax set forth in § 9 were enacted

---

**10.** See footnote 6, *supra.*

substantially verbatim from legislation proposed in 1970 by the Maryland Legislative Council Committee on Taxation and Fiscal Matters [11] and that this committee's report and the subsequent enactment manifested a clear legislative design to narrow the range of exempt property, we construed § 9(c) strictly. Applying this strict interpretation we found that the caretaker's residences there at issue were not actually used exclusively for public worship and hence were not entitled to exemption. Both *Lodge #817* and *Bosley* are consistent with the Tax Court's decision in this case.

■ Further, substantial evidence supports the Tax Court's decision. From the data and testimony before it, the court had grounds to conclude that the transfer of the apartments' entrance fees to the Corporations' capital fund did no more than replenish the fund for the amount depleted by the apartments' construction loans. Moreover, the corporate capital fund received money from many sources, and no evidence showed that the amounts attributable to the entrance fees were actually used for or were necessary for subsidizing the other facilities.[12] In light of this evidence, and given that the facilities in other respects operated independently of the apartments,[13] the apartments could reasonably be deemed not to meet § 9(e)'s "necessary for" and "actually used for" elements. It was well within the Tax Court's province to take this view of the facts, and

---

**11.** See 1970 Report, Md.Leg. Council Committee on Taxation and Fiscal Matters, Exhibit F; compare ch. 350 of the Acts of 1972.

**12.** In this connection we note that Asbury's audited financial statement for 1982, which was received into evidence, showed that though the home received a corporate subsidy in 1982 of $137,834, and had an operating deficit of $159,910, it had a capital surplus of $848,121. The health center, which had received a corporate subsidy of $80,423 in 1981, in 1982 received no corporate subsidy, had an operating deficit of $3,756, and had a $183,095 surplus in its capital fund.

**13.** The home, of course, existed for many decades before the apartments were constructed. The health center, as previously mentioned, in 1982 drew most of its residents not from the apartments but from the general public.

we therefore find that substantial evidence supports its decision.

## IV

■ The final issue concerns whether the apartments are entitled to a § 9(e) exemption when viewed separately from the other facilities in the Village complex. Here also a deferential standard of review is appropriate, for this issue is markedly similar to that we considered in *Group Health Ass'n.* There, the question was whether a health maintenance organization is a charitable organization under § 9(e); in the present case the question is whether apartments providing moderate income housing to the elderly fulfill a charitable purpose under § 9(e). We required deferential review in *Group Health Ass'n* and the strong parallels that case provides compel us to a like conclusion in the present instance. We must, once again, affirm the Tax Court's decision if it was not erroneous as a matter of law and was supported by substantial evidence.

As previously indicated, on this issue the Tax Court, quoting from the *Friends* circuit court opinion, relied on the legal proposition that "it is not charitable to provide low-cost housing to those who do not need financial assistance, whether they are young or old." Although perhaps expressed too categorically, when understood in the setting of the case no error taints this statement of the law.[14] Tax exemptions, as § 9(a) requires and we have repeatedly affirmed, are to be strictly construed; taxation is the rule, exemption the exception. *Bosley, supra,* 293 Md. at 218, 443 A.2d 91; Lodge # 817, supra, 292 Md. at 537–38, 439

---

14. The circuit court modified this rule essentially to add the words "and nothing more," *i.e.,* it altered the statement to read "it is not charitable to provide low-cost housing and nothing more to the elderly who do not need financial assistance." Although seemingly correcting the law, in reality the circuit court altered the Tax Court's findings of fact; it assumed the apartments did provide more than low-cost housing to the elderly, a factual finding the Tax Court rejected. We view this as an unwarranted invasion of the Tax Court's fact-finding functions.

A.2d 591; *Ballard v. Supervisor of Assess.,* 269 Md. 397, 403, 306 A.2d 506 (1973). No organization has an inherent right to tax exemption. *Bosley, supra,* 293 Md. at 212, 443 A.2d 91. On similar facts, courts from several other jurisdictions have rejected exemption claims. *Appeal of Marple Newtown School Dist.,* 500 Pa. 160, 455 A.2d 98 (1982) is a leading case. There the Supreme Court of Pennsylvania, considering the exemption claim of a retirement village similar to the Asbury Apartments, held the village subject to taxation, stating that "a private housing facility which for all practical purposes offers its residents no services beyond those which the residents demonstrate an ability to afford" does not achieve a charitable purpose. 455 A.2d at 100. The Supreme Court of Idaho reached a similar result in *Appeal of Sunny Ridge Manor, Inc.,* 160 Idaho 98, 675 P.2d 813 (1984), a case we cited with approval in *Group Health Ass'n.* In *Sunny Ridge,* the court, noting that the retirement center there at issue charged its residents fees sufficient to cover all of its current operating expenses as well as retire the debt on all its facilities, stated "[i]t is difficult to view as charitable such an arrangement." 675 P.2d at 817. *See also Friendship Manor v. State Department of Revenue,* 91 Ill.App.3d 91, 46 Ill.Dec. 641, 414 N.E.2d 525 (1980); *Retirement Homes of Detroit v. Sylvan Township,* 416 Mich. 340, 330 N.W.2d 682 (1982); *Evangelical Ret. Homes v. State Tax Com'n,* 669 S.W.2d 548 (Mo.1984); *Mattter of Barham,* 70 N.C.App. 236, 319 S.E.2d 657, *cert. denied,* 312 N.C. 622, 323 S.E.2d 921 (1984); *Friendsview Manor v. State Tax Commission,* 247 Or. 94, 420 P.2d 77 (1966).

The circuit court and Court of Special Appeals found that the apartments provided more than low and moderate income housing to the elderly; rather, in these courts' view, the apartments provided residents a life care guarantee reflected in the financial misfortune clause of the resident agreement. The Tax Court's decision, however, necessarily rests on the factual finding that this financial misfortune clause for years prior to 1983 was without real effect,

because no apartment residents had ever needed to invoke the clause.  In light of the significant financial requirements imposed on applicants by the apartments and the preliminary medical and financial screening that applicants underwent, we think this finding was well within the province of the Tax Court.  Substantial evidence supported this inference, and the circuit court and Court of Special Appeals erred in substituting a different factual conclusion.

JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED;  CASE REMANDED TO THAT COURT WITH DIRECTIONS TO REMAND THE CASE TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR ENTRY OF AN ORDER AFFIRMING THE ORDER OF THE MARYLAND TAX COURT DATED JULY 10, 1985. COSTS TO BE PAID BY APPELLEE.