556 A.2d 742

**PRINCE GEORGE'S COUNTY HEALTH DEPARTMENT, et al.**

v.

**C. Elaine BRISCOE, et al.**

**No. 1139, Sept. Term, 1988.**

Court of Special Appeals of Maryland.

April 28, 1989.

326

Judith K. Sykes, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. on the brief), Baltimore, for appellants.

Stephen M. Nassau (Statland, Nerenberg, Nassau & Buckley, on the brief), Washington, D.C., for appellees.

Argued before BLOOM, ROSALYN B. BELL and POLLITT, JJ.

ROSALYN B. BELL, Justice.

The Prince George's County Health Department (PG[1] Health Department) and the Department of Health and Mental Hygiene for the State of Maryland (HMH) appeal from a decision of the Circuit Court for Montgomery County[2] in favor of C. Elaine Briscoe and 18 other social workers employed at two HMH mental health facilities. These social workers asserted that, since they did the same work as psychiatric nurses employed at these facilities, they were entitled to be paid at the same grade level.

The issues we shall consider in this appeal are:

—Did the trial judge err by reversing the decision of the State Department of Personnel and remanding for reclassification?

—Did the trial judge err in permitting some of the social workers to intervene at the circuit court level?

—Did the trial judge err by awarding attorney's fees to the social workers?

We reverse and explain, after first setting forth the pertinent facts.

On July 30, 1985, C. Elaine Briscoe and 11 other social workers (PG social workers) filed the grievance that is the subject of this appeal. They alleged that the PG Health

---

1. We recognize the appropriate efforts of Prince George's County to assure the use of its full name as opposed to its initials. We mean no disrespect but use the initials purely for brevity and identification.

2. Section 10–215(b) of the Administrative Procedure Act provides that "a petition for judicial review shall be filed with the circuit court for the county where any party resides or has a principal place of business." Md. State Gov't Code Ann. (1984). Because HMH has facilities in Montgomery County, the petition could properly be filed in a Montgomery County court.

Department had violated Art. 64A, § 27(a), which provides, *inter alia*, that "all positions in the service involving comparable duties, experience, responsibilities and authority shall be paid comparable salaries in accordance with the relative value of the services to be performed." The PG social workers sought to have their salaries upgraded two levels to make them equivalent to the salaries received by the psychiatric nurses.[3] They also sought retroactive pay.

At the grievance hearing, the PG social workers presented some evidence showing that the clinical social workers and psychiatric nurses both performed primarily psychotherapy, and that cases were assigned based only on scheduling considerations; that is, there were no particular groups of cases assigned only to social workers or to nurses, although the nurses occasionally gave injections of prolixin, a psychotropic drug. A witness testifying on behalf of the PG social workers stated that "she was told" [4]

---

**3.** The formal title of the position held by psychiatric nurses at these facilities is Community Health Nurse. When the grievance was filed in 1985, the salary levels for the Social Worker and Community Health Nurse series were as follows:

| | Salary Grade | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| Social Worker | I | II | III | IV | V | VI | | |
| Community Health Nurse | | I | II | III | IV | V | VI | VII |

Following a one-grade salary adjustment for Social Workers for fiscal year 1987 and a one-grade adjustment for fiscal year 1988, the newly established Clinical Social Worker series spanned Grades 12–17 as of August 1, 1987. At that time Community Health Nurse series, which also received a one-grade update for fiscal year 1988, spanned Grades 12–18. The entry-level requirement is a master's degree for social workers and a bachelor's degree for nurses.

**4.** The transcript of the grievance hearing before the arbitrator reveals that, had the standard rules of evidence been applied, the PG social workers would have been left with little evidence of true probative value. For example, this particular witness was apparently called for the express purpose of stating opinions and conclusions as to why she was hired. She was not asked to state who interviewed her or *exactly* what she "was told." There are many other instances of evidence of questionable value. For example, another witness was called for the express purpose of testifying as to her "awareness" as to what the

when she was interviewed that she would be hired to relieve the nurses with more education so that they could do more psychotherapy. The social workers' representative made it clear that the grievance was limited to the situation at the PG Health Department and was not predicated on the relationship between psychiatric nurses and social workers throughout the State.

The State presented evidence that its Department of Personnel's Division of Salary Administration and Position Classification (DSAPC) had conducted a study at the request of the House Appropriations Committee in its 1986 session to determine whether the creation of one class called "Clinical Mental Health Therapist" for psychotherapists, which would include both social workers and psychiatric nurses, was appropriate. DSAPC conducted interviews with HMH program administrators to understand the multidisciplinary team approach used in HMH facilities and the role of each professional within the team. These teams consisted of employees classified as social workers, psychologists, and psychiatric nurses. DSAPC determined in its study that the professional personnel were not used interchangeably in all HMH facilities. In the HMH hospital setting, the professionals functioned within the boundaries of their discipline; that is, psychiatric nurses performed direct nursing patient care, psychologists did testing and evaluation, and social workers coordinated housing, knowledge of community resources and social services, and family counseling. DSAPC determined, however, that at the PG Health Department and at the Regional Institute for Children and Adolescents (RICA) [5] the professionals' functions overlapped:

"In the local mental health clinic and RICA there appears to have evolved a function of 'case manager.' Persons

---

practice was in Fairfax County, Virginia. The witness was never qualified as an expert, nor was it clear why Virginia hiring practice was relevant at this juncture.

**5.** RICA is a HMH facility located in Rockville.

functioning in this manner are providing services required by the patient regardless of the area of training and experience of the professional: for example, the nature of the out patient care provided in the mental health clinic setting is such that a nurse does not provide traditional nursing/patient care. Because psychological testing and assessment are generally provided by the school or hospital from which the patient was referred, the psychologist is not frequently called upon to provide those services. In fact, the nurse and psychologist may be as involved in the traditionally social worker areas of coordinating community services (housing, employment, etc.) and evaluating social and family history as the social worker. To the extent, then, that there is a commonality of function of the professionals in the mode of operation in the outpatient clinic and Regional Institute for Children and Adolescents, it is reflective of psychologists and nurses performing duties related to social services rather than reflection of social workers performing duties of nurses or psychologists, or reflective of functions (such as psychotherapy) which have been common to all these professionals."

DSAPC concluded that, under these circumstances, "we do not recommend creating a single classification spanning all three professions." DSAPC did recommend, however, that a new clinical social worker classification be created in order to attract social workers with qualifications relevant for clinical work. In addition to the study, the State offered evidence that the grievance was moot because the Legislature had adjusted the social workers' salaries twice since their grievance was filed, leaving only a one-grade disparity.

On July 15, 1987, the hearing examiner issued her opinion denying relief and dismissing the social workers' grievance. In her opinion, the hearing examiner observed that the DSAPC study indicated that social workers were not being over-utilized or under-compensated, but rather that the psychologists and psychiatric nurses were being under-utilized

and over-compensated. That is, there was no evidence to show that the PG social workers were under-paid—at most, it appeared that the psychiatric nurses were being over-paid for the duties they actually performed. The hearing examiner concluded that an additional salary increase was unsupported in light of the fact that the PG social workers were not acting as psychiatric nurses. Therefore, the hearing examiner concluded that the PG social workers had failed to satisfy their burden of proof as per COMAR 06.01.03.05.[6] They failed to show by a preponderance of the evidence that the State violated a law or regulation or had acted arbitrarily in denying a two-grade salary adjustment for the Social Worker series to establish parity with the Community Health Nurse series. The hearing examiner also concluded that Art. 64A, § 27, which relates specifically to the annual salary review process, indicates that pay plan amendments must address specific *classes*, rather than individual *positions*.

The PG social workers noted an appeal to the circuit court on August 13, 1987. In their subsequently filed petition, they asked the trial court to reverse the Department of Personnel's (DOP) decision and to increase their salaries to make them equal to the salaries of psychiatric nurses performing "similar" duties. They also requested retroactive pay. In addition, for the first time, they requested reclassification of their positions to make them equal to psychiatric nurses performing similar duties. The trial court permitted social workers employed at RICA to intervene in the appeal.

Two hearings were conducted in regard to the social workers' appeal. At the close of the first hearing, the trial judge stated:

---

6. COMAR 06.01.03.05 provides in pertinent part:
 "C. The employee bears the burden of proof in the following cases:
 (1) Grievance hearings;
 (2) Rejection on probation of employees not governed by § B of this regulation;
 (3) Appeal of termination of unclassified employee."

"THE COURT: Well, I can tell you, Madam State, that I am impressed with the arguments of appellant that are essentially in a broad scope due process kind of argument and equal protection like. I feel very strongly here that there is a strong reason, legal reasons, for bringing these people, if they are going to continue to be working in the same facility, on par, level with each other.

"Now, I am going to give you two choices. I am going to rule in favor of the appellant if I need to. I recognize that the State might have a vested interest in trying to do what they can to carve out an exception here so that they don't open those flood gates that I have talked about before.

"I will give you an opportunity to back away, knowing the way that I am intending to rule and see whether or not you can, in effect, cut a deal with [social workers' counsel] and these particular [social workers] so that you can perhaps exercise some damage control.

"On the other hand, if you wish, and I will let you have time to caucus with your co-counsel on it, I will rule, and I have told you the way I am going to rule, and then you will have a choice. You can take it down to Annapolis and see what the Appellate Courts have to say about it, or you can live with it."

It was decided that the parties would continue discussions. The parties were unable to reach an agreement, and on July 15, 1988, after a second hearing, the trial judge reversed the DOP's decision, remanding the case with instructions that DOP reclassify all the social workers, including the RICA intervenors. The trial judge, in his order, directed DOP "to revise an existing classification (such as that of Social Worker IV or Community Health Nurse IV, with appropriate change of title) or create a new classification to accommodate such reclassification." It was further ordered that DOP should consider in good faith awarding back pay retroactive to July 30, 1984 (a date one year prior to the filing of the grievance). The trial judge also directed the State to pay reasonable attorney's fees and expenses

and costs to the social workers. The trial judge did not issue an opinion, or state the precise ground for his decision.

—Standard of Review—

The standard of review of the DOP decision is set forth in § 10–215(g)(3) of the Maryland Administrative Procedure Act, which provides that a reviewing court may

"(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision of the agency:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the agency;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious."

Md. State Gov.Code Ann. (1984).

A reviewing court's role under this statute of an agency decision goes very little beyond its inherent power of review to prevent illegal, unreasonable, arbitrary or capricious administrative action. *Harford Memorial Hosp. v. Health Servs. Cost Review Comm'n,* 44 Md.App. 489, 506, 410 A.2d 22 (1980). In *State Administration Board of Election Laws v. Billhimer,* 314 Md. 46, 58–59, 548 A.2d 819 (1988), the Court described two different standards of review. The first standard applies to the agency's finding of facts, as well as the inferences to be drawn from these facts. In these situations, the "substantial evidence test" is applied; that is, if the agency decision is supported by substantial evidence, it will not be overturned. In applying the substantial evidence test, a reviewing court must *not* substitute its own judgment for that of the agency, as the agency is presumed to have some expertise—"the test is a deferential one, requiring 'restrained and disciplined judicial judgment so as not to interfere with the agency's factual conclu-

sions." *Billhimer*, 314 Md. at 58–59, 548 A.2d 819, quoting *Supervisor of Assessments of Montgomery County v. Asbury Methodist Home, Inc.*, 313 Md. 614, 625, 547 A.2d 190 (1988).

On the other hand, if the agency's decision "is predicated on an error of law, no deference is appropriate and the reviewing court may substitute its judgment for that of the agency." *Billhimer*, 314 Md. at 59, 548 A.2d 819.

These relatively simple standards are somewhat problematical when one tries to apply them to the instant case because the trial judge did not explicitly indicate the precise grounds on which he was reversing the DOP decision. To have reversed the DOP's decision based on its factual conclusions or inferences would have been unreasonable because the facts in the instant case were essentially uncontroverted. Indeed, the State stipulated that the PG social workers and the PG psychiatric nurses who testified at the grievance hearing perform substantially the same duties. Thus, we have no difficulty in holding that the agency's factual findings were adequately[7] supported by the evidence presented.

The record indicates that the trial judge asked many questions and made statements during both hearings that indicated he was concerned with the underlying fairness of the situation; he referred at one point, in the passage we set forth previously, to due process and equal protection. It therefore seems fair to assume that he was reversing the DOP's decision as unconstitutional, as per § 10–215(g)(3)(i).

We see, however, no colorable violation of the social workers' (appellees) constitutional right to due process or equal protection. We fail to see how procedural due process is even remotely an issue, as there are no allegations

---

7. We use the word "adequately" because the evidence introduced at the hearing had somewhat shaky foundations. *See* n. 4, *supra.* This does not trouble us unduly because the State stipulated that both groups were performing similar tasks and COMAR 06.01.03.02 provides that "these hearings are conducted informally."

that any State action was taken without an opportunity for the appellees to present their grievance and be heard. Assuming the trial judge was referring to substantive due process, we also fail to see a violation. The due process clause of the 14th amendment has substantive as well as procedural content. *See, generally, Moore v. East Cleveland,* 431 U.S. 494, 501–02, 97 S.Ct. 1932, 1936–37, 52 L.Ed.2d 531 (1977). Substantive due process means that state action which deprives a person of life, liberty or property must have, at the very least, a rational basis. The essence of substantive due process is protection from arbitrary and unreasonable action. *Babineaux v. Judiciary Commission,* 341 So.2d 396, 400 (La.1976). Put another way, the due process clause has been construed to proscribe matters of substance, as well as inadequate procedures, and to protect from State invasion all fundamental rights. *Whitney v. California,* 274 U.S. 357, 373, 47 S.Ct. 641, 647, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). But fundamental rights are limited to those Bill of Rights provisions that the Supreme Court has selectively incorporated.[8] Absent an infringement of a fundamental right or use of a suspect classification (such as race), the rational basis test is the proper standard of review for *both* substantive due process *and* equal protection challenges. *Chesapeake Bay Village, Inc. v. Costle,* 502 F.Supp. 213, 226 (D.C.Md.1980). Not all minor variations in the application of state laws to different groups violate the 14th Amendment's equal protection command. *Unity Party v. Wallace,* 707 F.2d 59, 63 (2d Cir.1983).

A standard equal protection analysis encompasses three phases. First, it must be determined whether persons similarly situated are in fact being treated differently. If

---

**8.** There have been some rights recognized by the Supreme Court, such as the right to privacy, which are not specifically mentioned within the Bill of Rights, but which the Court has interpreted as essential to the enjoyment of particular Bill of Rights guarantees. *See, e.g., Roe v. Wade,* 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Griswold v. Connecticut,* .381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).

this is the case, then it must be ascertained whether the difference in treatment operates to the disadvantage of a suspect class or impinges upon a fundamental right, in which case strict judicial scrutiny must be applied. If it can find no such detriment, then the court must ascertain whether the difference in treatment furthers some legitimate state purpose. *See, e.g., San Antonio Independent School Dist. v. Rodriquez,* 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973).

In the instant case, we are not convinced that similarly situated persons are being treated differently. The appellees and the psychiatric nurses may be seen as similarly situated *only* by virtue of the fact that the appellees and nurses perform many similar duties. They do *not,* however, have identical qualifications. The appellees simply cannot perform some of the functions that are performed by nurses. At the grievance hearing, one of the nurses who testified on behalf of the appellees stated that she *was* occasionally called upon to give shots and administer medication, a task the appellees cannot perform by virtue of licensing requirements and lack of training. The fact that the nurse was not often called upon to do this is irrelevant. Even if a nurse at one of these facilities was *never* called upon to administer medication, the fact remains that he or she could do so, if necessary, in an emergency or if the facilities change their present structure or treatment policies. The fact that the State does not choose to take advantage of the nurses' special capabilities, using them mostly to perform psychotherapy, does not erase the basic difference in qualification and background between the two groups. We fail to find these two groups similarly situated for equal protection purposes. Even if we were to consider the two groups similarly situated, the State would have a legitimate interest in paying the nurses on a different scale as their qualifications do differ. Moreover, the State might wish to attract more nurses to State positions. The State would also have a legitimate interest in retaining the flexibility to operate its outpatient-type facilities (PG Health

Department and RICA) in a different manner from its psychiatric hospitals. To impose any other standard in the instant case would have the effect of mandating what was rejected in the legislative study in regard to a proposed single position for clinical mental health therapists. We hold that the DOP's decision did not violate any constitutional right of the appellees.

—Pay Plan—

■ The only other ground on which the trial judge could have reversed the DOP's decision would be in regard to that agency's interpretation of Art. 64A, § 27(a),[9] which in pertinent part provides:

"(a) **Establishing and recommending pay plan.**—After consultation with appointing authorities, the Secretary of Personnel shall prepare and recommend to the Governor a pay plan for *all classes of positions* in both the classified and unclassified service to the end that *all positions in the service involving comparable duties, experience, responsibilities and authority shall be paid comparable salaries* in accordance with the relative value of the services to be performed. In establishing rates of pay, the Secretary shall give consideration to experience, the prevailing rates of pay for the services performed, and for comparable services in public and private employment, living costs, maintenance or other benefits received by employees, and the State's financial condition and policies. The pay plan shall take effect and shall have the force and effect of law after approval by the Governor, at the time the next State budget takes effect, if funds for the pay plan are provided therein. *Amend-*

9. Effective as of July 1, 1988, this section was rewritten—the only addition or change of note for our purposes is that the new version provides that the

"Secretary, with the approval of the Governor, may amend the pay plan for specific classifications of positions in order to recruit or retain competent personnel or to ensure that compensation rates adequately compensate the skills, knowledge, effort, responsibility, and working conditions."

*ments to the pay plan may be made from time to time for specific classes of positions when recommended by the Secretary and approved by the Governor and so presented to the General Assembly on or before December 20 of each year."* (Emphasis added.)

Md. State Gov.Code Ann. (1988). The DOP hearing examiner concluded that this statute addresses specific *classes, i.e.,* the statewide Social Worker series and the statewide Community Health Nurse series, rather than particular positions *within* the series. We agree.

Article 64A, § 27 establishes the procedure for establishing or changing the rate of pay. It does not, however, apply to pay changes in regard to individual positions—it applies to "classes of positions." The Merit System, of which this section is a part, was intended to provide standards of employment and advancement through testing in order to prevent problems such as nepotism and related abuses. *Secretary, Maryland Dept. of Personnel v. Bender,* 44 Md.App. 714, 715, 411 A.2d 107 (1980), *aff'd,* 290 Md. 345, 430 A.2d 66 (1981). By its very terms, it is a system of statewide classification. Article 64A, § 1(4) of the Merit System defines "class" as:

"a grouping of one or more positions sufficiently similar with respect to duties and responsibilities that the same descriptive title may be used to designate each position in that grouping and that the *same general qualifications* are needed for performance of the duties, that the same tests of fitness shall be used to select employees, and that the same rates of pay shall be applied to all positions in that grouping." (Emphasis added.)

Section 27(a), the provision upon which the social workers rely, requires that changes to the pay plan must be recommended by the Secretary of Personnel, approved by the Governor, and ultimately presented to the General Assembly. The hearing examiner did not have the power to effect a modification in regard to the pay scale or classification system of the appellees.

Evidence presented at the hearing showed that the secretary had acted, even before this grievance was filed, making recommendations that resulted in class-wide salary increases for the social workers' fiscal years 1987 and 1988. Moreover, the testimony presented at the grievance hearing did not establish, nor was it meant to establish, an entitlement for the *entire* social worker series. The testimony was addressed only to the situation in the PG Health Department. Additionally, the DSAPC study conducted at the request of the Legislature made clear that, while a commonality of functions had been found at the PG Health Department and at RICA, social workers and psychiatric nurses were *not* used interchangeably in all facilities. Given this, we hold that the hearing examiner correctly determined that Art. 64A, § 27(a) did not entitle the social workers to the relief they sought, and that the trial judge erred in reversing the agency's decision.

Appellees rely on *Frosburg v. State Department of Personnel,* 37 Md.App. 18, 375 A.2d 582, *cert. denied,* 281 Md. 737 (1977). *Frosburg* differs from the instant situation in several important respects. In *Frosburg,* employees classified as Drivers License Reviewers filed a grievance because there was a five-grade discrepancy between their positions and a newly created position entitled Hearing Officer I and II. A study performed by the DOP Classification and Compensation Division found that the work performed by the two types of employees was virtually identical. The study recommended that the Drivers License Reviewers be upgraded and reclassified, which is precisely what the DOP grievance hearing examiner did. *Frosburg,* 37 Md.App. 18, 20–21, 375 A.2d 582. No back pay was awarded, however. The sole issue on appeal in *Frosburg* was whether the doctrine of sovereign immunity prevented an award of back pay.[10] The entitlement of the drivers license reviewers to

---

**10.** The Court in *Frosburg* held that sovereign immunity did prevent an award of back pay, stating that unless the drivers license reviewers could point to a specific statutory waiver and that there were funds

the upgrade was simply not an issue in *Frosburg*. In that case, all of the class members participated in the grievance and there was an existing class into which they fit. The hearing officer in *Frosburg* found that the drivers license reviewers were already performing 99 percent of the tasks performed by the Hearing Officer series, and were not prevented from continuing to do so by virtue of the fact that they did not have law degrees. In the instant case, appellees cannot be placed into the higher paid class because they are not qualified as psychiatric nurses. Moreover, Art. 64A, § 27(a) provides for "comparable," *not* identical salaries.

—Reclassification—

■ Appellees' contention that they were misclassified and entitled to reclassification under Art. 64A, § 16 was raised for the first time at the circuit court level. The trial judge, however, considered the issue and ordered that appellees be reclassified. We hold that the trial judge erred in considering and ordering the reclassification. We explain.

A party is bound by the theory he or she elects to pursue before the administrative agency and may not change theories on appeal. *Chertkof v. Department of Natural Resources*, 43 Md.App. 10, 16, 402 A.2d 1315, *cert. denied*, 286 Md. 745 (1979). We recently reaffirmed the requirement that only issues which have been raised and decided at the administrative level may be heard on appeal in *Maryland State Retirement and Pension Systems v. Martin*, 75 Md.App. 240, 248, 540 A.2d 1188 (1988). In *Martin*, we reversed the decision of the trial court which had raised, developed, and ruled upon issues not presented by the parties or considered by the agency because a reviewing court is restricted to the record made before the administrative agency. *Martin*, 75 Md.App. at 248, 540 A.2d 1188.

---

available, "this suit for back pay is an attempt to recover unappropriated funds from the State Treasury and must perforce be dismissed." *Frosburg*, 37 Md.App. at 31–32, 375 A.2d 582.

There are good reasons for applying that rule in the instant case. Classification of employees within the Merit System is a highly specialized area. Although the trial judge implicitly acknowledged his lack of expertise in personnel matters by remanding to the DOP to determine *how* to reclassify, expertise was required in deciding whether reclassification was required in the first instance. Evidence as to qualifications, job specifications and job performance both of social workers and psychiatric nurses would have been needed; such evidence was simply not presented.

■ Even if the hearing officer could be said to have been obliged to grant relief which had not been requested, her failure to reclassify was not erroneous as a matter of law. Article 64A, § 16, combined with the applicable employee grievance procedures, makes it possible for State employees to file a grievance in order to have a position reclassified. The employee must show, however, that he or she has been misclassified or has been working out of class because there is another existing class with duties, responsibilities, and qualifications which is more consistent with what the employee actually does.

The Merit System distinguishes between the establishment of classes of positions (which is subject to gubernatorial approval) and the reclassification of a particular position into a different already existent class, which is the responsibility of the Department of Personnel. Article 64A, § 16 provides in pertinent part:

"(a) *Subject to the approval of the Governor, the Secretary of Personnel shall establish classes and classify therein all positions in the classified service,* and shall, from time to time, thereafter as may be necessary, establish additional classes and classify therein new positions created, and may combine, alter or abolish existing classes. *Each class shall embrace all positions similar in respect to the duties and responsibilities appertaining thereto and the qualifications required for the fulfillment thereof and shall be given a classification title indicative of the character and rank of the em-*

*ployment. ... Any change in the duties of a position, if material, shall operate to abolish it and create a new position which shall be classified under this section.*

"(b) In order to insure that positions in the Maryland State service are properly classified, the Secretary shall periodically audit a random sample of all positions under his salary jurisdiction. The Secretary may order a State department or agency to take appropriate action to bring any position determined to be inappropriately classified into compliance with the audit and findings of the Secretary. A filled position which is declared to be underclassified shall be reclassified immediately or not later than the beginning of the next fiscal year following the determination."

Thus, establishing classifications, like establishing a pay plan, is subject to gubernatorial approval. If the duties of a particular "position" change in some "material" respect, such change "shall operate to abolish it and create a new position" in another classification. Accordingly, only an employee whose position involves sufficiently similar job qualifications and duties as those within an established classification is entitled to have his or her job reclassified. *See* COMAR 06.01.01.01.B(4).[11] There was no evidence adduced before the agency that appellees' duties were sufficiently similar to those of the psychiatric nurses such that the appellees should be reclassified into the Community Health Nurse series. The testimony showed *not* that appellees were performing nurse functions, but rather the nurses were performing social worker functions—showing at most that appellees performed the same work as members of

---

**11.** COMAR 06.01.01.01.B(4) provides:

"(4) 'Class' or 'class of position' means a group of positions established under these regulations sufficiently similar in respect to the duties and responsibilities thereof and the entrance qualifications required therefor that the same descriptive title may be used to designate them, that the same requirements as to education, experience, knowledge, and ability may be demanded of applicants, the same test of fitness used to choose qualified incumbents, and the same schedule of compensation made to apply with equity."

another class who may well have been overclassified. Moreover, appellees lacked the qualifications needed for those positions.

The trial judge ordered the DOP to revise an existing classification or to create a new classification if such action was necessary. There is simply no basis in the Merit System for such an order.

## INTERVENTION

■ Appellants contend that the RICA social workers, who never filed a grievance at the agency level, should not have been allowed to intervene when the case reached the circuit court on appeal. We agree and explain.

Statutorily prescribed administrative remedies must ordinarily be pursued and exhausted; such exhaustion is a prerequisite to judicial review. The general rule is that where a statute provides a special form of remedy, the plaintiff must use that form rather than any other. *Soley v. State of Maryland Comm'n on Human Relations*, 277 Md. 521, 526, 356 A.2d 254 (1976). In *Soley*, the Court, observing that this rule was supported by sound reasoning, stated:

> "The decisions of an administrative agency are often of a discretionary nature, and frequently require an expertise which the agency can bring to bear in sifting the information presented to it. The agency should be afforded the initial opportunity to exercise that discretion and to apply that expertise. Furthermore, to permit interruption for purposes of judicial intervention at various stages of the administrative process might well undermine the very efficiency which the Legislature intended to achieve in the first instance. Lastly, the courts might be called upon to decide issues which perhaps would never arise if the prescribed administrative remedies were followed."

*Soley*, 277 Md. at 526, 356 A.2d 254.

In the instant case, the administrative procedures to be followed by a State employee who wishes to file a grievance

are set out in the Merit System's grievance procedures, Art. 64A, § 52–56. By failing to require the RICA social workers to follow that procedure, the trial judge deprived the agency of the opportunity to hear evidence and make findings of fact as to the RICA employees, who worked at a Rockville facility, a facility perhaps different from the PG Health Department. The agency never heard direct testimony from persons employed at RICA. Additionally, appellants never had an opportunity to put evidence in the administrative record in regard to the RICA social workers. The only evidence in the record as to the RICA employees was in the DOP's study in which the RICA facility was mentioned.

■ Appellees contend that the exhaustion of remedies doctrine is inapplicable here because their case falls within an exception to the general rule, *i.e.,* where there is no adequate administrative remedy, or provision for review of the agency decision. *See Soley,* 277 Md. at 527, 356 A.2d 254. This argument is best answered by pointing out that, since appellants claim is grounded in the theory that the agency *did* have a remedy it should have provided, it would be quite inconsistent to insist that the RICA social workers should not be required to go through the statutorily required administrative process because no remedy existed. Appellees also argue that it would have been futile for the RICA social workers to use the administrative process because the DOP had made clear its position on this issue by its ruling in regard to the PG social workers. Given the fact that the hearing officer was never given the opportunity to hear evidence and make a decision on the reclassification issue, there is no basis for the contention that the DOP has evidenced a strong position such that it would make any action filed by the RICA social workers at the administrative level an exercise in futility. It simply appears that the RICA social workers are availing themselves of the administrative process, but attempting to bypass some of the steps. As the Court pointed out in *Prince George's County v. Blumberg,* 288 Md. 275, 292, 418 A.2d 1155 (1980), an

administrative remedy is not inadequate so as to authorize judicial intervention before exhaustion merely because it is accompanied by delay, expense, annoyance, or even some hardship.

The imposition of the exhaustion of remedies rule in the instant case would not be the imposition of a mere technical requirement. Given the dearth of evidence in the administrative record (or before the circuit court) as to the RICA employees, the trial judge was not in a position to make an informed or intelligent ruling about the RICA employees.

## ATTORNEY'S FEES

 The trial judge awarded attorney's fees to appellees. At the close of the hearing, the trial judge asked if there were any additional matters and the following colloquy ensued:

"[SOCIAL WORKERS' ATTORNEY]: Well, we request costs in the matter, and I have a request in for attorneys' fees. We do have a group of individuals who had to fight the State with great difficulty. We would ask the Court grant them an award of attorneys' fees against the State in this matter.

"THE COURT: I think that is a fair request. Do you want to be heard on that, Madam State?

"[ATTORNEY FOR THE STATE]: Well, I would certainly object to that. I don't know on what basis he is requesting these attorneys' fees.

"THE COURT: I assume on a number of bases, that these litigants have been forced to fight tooth and nail on a matter which they feel, and I can tell you quite frankly

that I feel, that they were entitled to in the first place and incurred a great amount of lawyers' fees in the process. It costs money for people to have to go out and hire lawyers to exercise rights that some, including me, would think they were entitled to in the first place.

"You, and I mean no disrespect to you, are on salary. You will get paid regardless of what happens. These folks have to go out and shell it out of their own pockets. So I am going to order up reasonable lawyers' fees and costs.

"Anything else?

"[SOCIAL WORKERS' ATTORNEY]: Thank you, Your honor, that's fine."

We hold that this award was an abuse of discretion and explain.

Rule 1–341 governs awards of attorney's fees and is entitled "Bad Faith—Unjustified Proceeding." The Rule's title is illustrative; the rule itself provides:

"In any civil action, if the court finds that the conduct of any party in maintaining or defending any proceeding was in bad faith or without substantial justification the court may require the offending party or the attorney advising the conduct or both of them to pay to the adverse party the costs of the proceeding and the reasonable expenses, including reasonable attorney's fees, incurred by the adverse party in opposing it."

This Rule represents a limited exception to the general rule that attorney's fees are *not* recoverable by one party from an opposing party. It is intended to prevent parties and attorneys from abusing the judicial process by filing or defending actions "in bad faith" or "without substantial

justification." It is not intended to punish legitimate advocacy. *Legal Aid Bureau, Inc. v. Farmer,* 74 Md.App. 707 (1988). In *Legal Aid Bureau, Inc. v. Bishop's Garth,* 75 Md.App. 214, 224, 540 A.2d 1175, *cert. denied,* 313 Md. 611, 547 A.2d 188 (1988), we observed that Rule 1–341 is *not* (and never was) intended to be "used as a weapon to force persons who have a questionable or innovative cause to abandon it because of a fear of the imposition of sanctions." Instead, we stated that awards of attorney's fees under the Rule are "judicially guided missiles pointed at those who proceed in the courts *without any colorable right* to do so." *Bishop's Garth,* 75 Md.App. at 224, 540 A.2d 1175 (emphasis added). Rule 1–341 is simply not intended to penalize a party or counsel for asserting a colorable claim or defense. *Yamaner v. Orkin,* 313 Md. 508, 516, 545 A.2d 1345 (1988).[12] The Rule requires the trial judge to make a finding of either bad faith or lack of substantial justification before making an award. *Yamaner,* 313 Md. at 509, 545 A.2d 1345.

In the instant case, the trial judge made none of the required specific findings. A finding that appellees "had been forced to fight tooth and nail on a matter" does not, by itself, support a finding of bad faith or lack of substantial justification. Nor does it when joined with the fact that an attorney representing the State is paid via a regular salary. Indeed, the trial judge seems to have based his award on a sort of "deep pockets" theory. At no point did the trial judge in the instant case indicate that appellants had not raised colorable arguments. In fact, at the close of the initial hearing, he thanked both parties for "very fine briefs on both sides." In light of the absence of bad faith or lack of substantial justification, we hold that the award of attor-

---

**12.** We note in passing that *Yamaner* reversed an award of attorney's fees made by the same trial judge making the award in the instant case.

ney's fees was without any basis in law. We do, however, exercise our discretion and decline to award costs to appellants.[13]

JUDGMENT REVERSED.

THE PARTIES TO BEAR THEIR OWN COSTS.

---

**13.** We wish to point out that cases such as this, whether decided by an administrative agency or a court of law, rise and fall on the letter of the law. This does not mean, however, that to pay two people different salaries for what amounts to very similar work is good general employee management policy. On the contrary, as illustrated in the instant case, such a policy creates very real employee morale problems. Discontent with financial rewards inhibits employee performance; the resentment accompanying unfair wage differentials may create powerful dissension. *See* Peter Drucker, *The Practice of Management* 312 (1954). Equitable compensation is usually a strong motivator of productive performance and employees generally perform at peak levels when they know their compensation reflects merit. Leften, Buzzotta, Sherburg and Karraker, *Effective Motivation Through Performance Appraisal* 2–3 (1980). These, however, are problems that must ultimately be left to the legislative and executive branches.